FAY ARFA, A LAW CORPORATION
Fay Arfa, Attorney at Law
State Bar # 100143
10100 Santa Monica Blvd., #300
Los Angeles, CA 90067
Tel.: (310) 841-6805
Fax: (310) 841-0817

Attorney for Defendant
TIMOTHY LEE DRIGGARS, JR.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY LEE DRIGGARS, JR., | No. SACV09 - 1406   DOC(SS) |
| Petitioner, | MEMORANDUM OF POINTS AND AUTHORITIES IN |
| v. | SUPPORT OF PETITION |
| MIKE MCDONALD, Warden | FOR WRIT OF HABEAS |
| Respondent. | CORPUS BY A PERSON IN STATE CUSTODY (28 U.S.C. § 2254.) |

Petitioner alleges:

1.     Petitioner TIMOTHY LEE DRIGGARS, JR.  (CDC No. V-43868) is

unlawfully restrained of his liberty and imprisoned by Warden Mike

McDonald, at High Desert State Prison, in Susanville, CA.

2.     Warden McDonald purports to imprison Mr. Driggars by authority of

1

1   FAY ARFA, A LAW CORPORATION
2   Fay Arfa, Attorney at Law
    State Bar # 100143
3   10100 Santa Monica Blvd., #300
4   Los Angeles, CA 90067
    Tel.: (310) 841-6805
5   Fax: (310) 841-0817
6
7   Attorney for Defendant
    TIMOTHY LEE DRIGGARS, JR.
8
                **IN THE UNITED STATES DISTRICT COURT**
9
10              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
11
12  TIMOTHY LEE DRIGGARS, JR.,          )       No.
                                        )
13          **Petitioner,**              )
                                        )       **M E M O R A N D U M   O F**
14                                      )       **P O I N T S   A N D**
    v.                                  )       **A U T H O R I T I E S   I N**
15                                      )       **SUPPORT OF PETITION**
                                        )       **FOR WRIT OF HABEAS**
16  MIKE MCDONALD, Warden               )       **CORPUS BY A PERSON IN**
                                        )       **STATE CUSTODY** (28
17          **Respondent.**              )       U.S.C. § 2254.)
18                                      )
19
20
21
22
23
24
25
26
27
28

# TOPICAL INDEX

Page

**VERIFICATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**The Incident** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**The Gang Evidence** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Defense Case** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**The Incident** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**The Gang Evidence** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**I.** **HABEAS RELIEF SHOULD BE GRANTED BECAUSE THE EVIDENCE FAILED TO SUPPORT THE ATTEMPTED MURDER VERDICT** . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    **A.** **Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    **B.** **Standard of Review** . . . . . . . . . . . . . . . . . . . . . . . . 12

    **C.** **Attempted Murder Requires the Specific Intent to Kill** . . 13

    **1.** **Self-Defense and Defense of Others** . . . . . . . . . . . . . . 13

    **D.** **The Evidence Shows Petitioner Either Not Guilty or Guilty of Attempted Voluntary Manslaughter** . . . . . . . . . . . . . 14

**II.** **HABEAS RELIEF SHOULD BE GRANTED BECAUSE TRIAL COUNSEL'S FAILURE TO PRESENT CRITICAL EXCULPATORY EVIDENCE OF MEJIA'S DRUG USE AND A DRUG EXPERT DEPRIVED PETITIONER OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL** . . . . . . . . . . . . . . . . . . . . . . . . . . 15

i

A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

B.   The Constitution Guarantees a Criminal Defendant the
     Right to the Effective Assistance of Counsel and the Right
     to Present a Defense  . . . . . . . . . . . . . . . . . . . . . . . . . 16

C.   Trial Counsel Rendered Ineffective Assistance by Failing to
     Present Evidence of Mejia's Drug Use and a Drug Expert 16

III.  HABEAS RELIEF SHOULD BE GRANTED BECAUSE TRIAL
     COUNSEL'S FAILURE TO PRESENT A MENTAL HEALTH
     EXPERT DEPRIVED  PETITIONER OF THE EFFECTIVE
     ASSISTANCE OF TRIAL COUNSEL  . . . . . . . . . . . . . . . . . . . . 19

A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B.   The Constitution Guarantees a Criminal Defendant the
     Right to the Effective Assistance of Counsel and the Right
     to Present a Defense  . . . . . . . . . . . . . . . . . . . . . . . . . 20

C.   Trial Counsel's Failure to Retain a Psychologist to Testify
     on Petitioner's Behalf Constituted Ineffective Assistance 21

IV.  HABEAS RELIEF SHOULD BE GRANTED BECAUSE TRIAL
     COUNSEL'S FAILURE TO PRESENT A DEFENSE   GANG
     EXPERT DEPRIVED  PETITIONER OF THE EFFECTIVE
     ASSISTANCE OF TRIAL COUNSEL  . . . . . . . . . . . . . . . . . . . . 24

A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

B.   The Constitution Guarantees a Criminal Defendant the
     Right to the Effective Assistance of Counsel and the Right
     to Present a Defense  . . . . . . . . . . . . . . . . . . . . . . . . . 25

C.   Trial Counsel's Failure to Present a Defense Gang Expert
     Denied Defendant the Right to the Effective Assistance of
     Counsel  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**V.   HABEAS RELIEF SHOULD BE GRANTED BECAUSE TRIAL COUNSEL'S FAILURE TO PRESENT PETITIONER'S PAROLE OFFICER TO CORROBORATE PETITIONER'S DESIRE TO REMOVE HIS TATTOOS DEPRIVED PETITIONER OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL** . . . . . . . . . . . 30

    **A.   Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    **B.   The Right to the Effective Assistance of Counsel Requires an Attorney to Investigate the Case and Present a Defense** . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    **C.   Trial Counsel's Failure to Adequately Investigate Petitioner's Case and Present His Parole Officer Deprived Petitioner of the Effective Assistance of Counsel** . . . . . . 30

**VI.   HABEAS RELIEF SHOULD BE GRANTED BECAUSE TRIAL COUNSEL'S FAILURE TO INVESTIGATE, OBTAIN AND INTRODUCE PETITIONER'S MEDICAL RECORDS DEPRIVED PETITIONER OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL** . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    **A.   Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    **B.   The Right to the Effective Assistance of Counsel Requires an Attorney to Investigate the Case and Present a Defense** . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    **C.   Trial Counsel's Failure to Present Petitioner's Medical Records Constituted Ineffective Assistance** . . . . . . . . . . 32

**VII.   HABEAS RELIEF SHOULD BE GRANTED BECAUSE TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY ADMITTING THE TRANSCRIPT AND NOT THE TAPE OF PETITIONER'S POLICE INTERVIEW INTO EVIDENCE** . . . . . . . 34

    **A.  Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

iii

   B.   Transcripts and/or Tape Records Are Not Admissible under
        Certain Circumstances . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

   C.   Trial Counsel Rendered Ineffective Assistance by
        Stipulating to the Accuracy of the Transcripts and in
        Failing to Admit the Tapes Themselves  . . . . . . . . . . . . . . 35

VIII. HABEAS RELIEF SHOULD BE GRANTED BECAUSE TRIAL
      COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING
      TO OBJECT TO THE ERRONEOUS ADMISSION OF IRRELEVANT
      AND PREJUDICIAL EVIDENCE CONSISTING OF A SKI MASK,
      GLOVES AND RAP LYRICS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

   A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

   B.   The Evidence Code Permits the Introduction of Evidence If
        the Probative Value Outweighs the Prejudicial Effect     . 37

   C.   Trial Counsel Rendered Ineffective Assistance by Failing to
        Object to the Erroneous Admission of Irrelevant and
        Prejudicial Evidence about a Ski Mask and Gloves . . . . . 37

IX.  HABEAS RELIEF SHOULD BE GRANTED BECAUSE THE TRIAL
     COURT DEPRIVED  PETITIONER OF THE RIGHT TO PRESENT A
     DEFENSE BY UNFAIRLY RESTRICTING PETITIONER'S AND HIS
     GRANDMOTHER'S TESTIMONY AT TRIAL  . . . . . . . . . . . . . . . 39

   A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

   B.   The Constitution Guarantees a Criminal Defendant the
        Right to Prepare and Present a Defense. . . . . . . . . . . . . . 39

   C.   Relief Should Be Granted Because the Trial Court Denied
        Petitioner His Constitutional Right to Present a Defense by
        Restricting His and His Grandmother's Testimony . . . . . 40

   Petitioner's Grandmother  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

   Petitioner's Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

iv

X.    HABEAS RELIEF SHOULD BE GRANTED BECAUSE TRIAL
      COUNSEL'S FAILURE TO CHALLENGE THE ADMISSION OF THE
      PREJUDICIAL HEARSAY EVIDENCE PRESENTED VIA THE
      GANG EXPERT DEPRIVED PETITIONER OF THE EFFECTIVE
      ASSISTANCE OF COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

      A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

      B.    California Law Prohibits an Expert from Presenting
            Inadmissible Hearsay as the basis for His/Her Opinion   . 47

      C.    Trial Counsel's Failure to Move to Exclude Ruiz' Prejudicial
            Hearsay Statements Linking Petitioner to the Criminal
            Street Gangs Deprived Petitioner of the Effective
            Assistance of Trial Counsel . . . . . . . . . . . . . . . . . . . . . . . 48

XI.   HABEAS RELIEF SHOULD BE GRANTED BECAUSE THE TRIAL
      COURT DEPRIVED PETITIONER OF DUE PROCESS AND A FAIR
      JURY TRIAL BY ADMITTING THE GANG EXPERT'S TESTIMONY
      ON THE ULTIMATE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

      A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

      B.    California Law Restricts Expert Opinion   . . . . . . . . . . . . 51

      C.    The Trial Court Deprived Petitioner of Due Process and a
            Fair Trial by Failing to Exclude the Gang Expert's Opinion
            on Ultimate Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

XII.  HABEAS RELIEF SHOULD BE GRANTED BECAUSE THE
      PROSECUTOR COMMITTED PREJUDICIAL MISCONDUCT BY
      VOUCHING FOR THE WITNESSES' CREDIBILITY . . . . . . . . . . 56

      A.    Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

      B.    A Prosecuting Attorney Commits Misconduct by to
            Expressing His or Her Personal Belief as to the Reliability
            of a Witness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

1

2      **C.**    **The Prosecutor Committed Prejudicial Misconduct by**
3               **Vouching for the Witness' Credibility** . . . . . . . . . . . . . . . 57

4   **XIII.**  **HABEAS RELIEF SHOULD BE GRANTED BASED ON THE**
5          **CUMULATIVE EFFECT OF THE ERRORS** . . . . . . . . . . . . . . . 60

6   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

7   **EXHIBIT A** . Mejia's Medical Records/Progress Note/Investigation Report
8
9   **EXHIBIT B** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Information on THC

10  **EXHIBIT C** . . . . . . . . . . . . . . . . . . . . Declaration of Jody Ward, Ph. D
11
12  **EXHIBIT D** . . . . . . . . . . . . . . . . . . . Declaration of Jose Lopez, Ph. D.

13  **EXHIBIT E** . . . . . . . . . . . . . . . . . . . Declaration of Jessica Latumeten

14  **EXHIBIT F** . . . . . . . . . . . . . . . . . . Petitioner Driggar's Medical Records
15
16  **EXHIBIT G** . . . . . . . . . . . . . . . . . . . . . . . . Transcript of Interview

17  **EXHIBIT H** . . . . . . . . . . . . . . . . . . . Modified Transcript of Interview
18
19  **EXHIBIT I** . . . . . . . . . . . . . . . . . . Declaration of Nancy Jean Kingston

20  **EXHIBIT J** . . . . . . . . . . . . . . . . . . . . . . . Subpoena to Trial Counsel

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Burks v. U.S.*, 437 U.S. 1 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*California v. Trombetta*, 467 U.S. 479 (1984) . . . . . . . . . . . . . . . . . . . 16

*Chambers v. Mississippi*, 410 U.S. 284 (1973) . . . . . . . . . . . . . 16, 20, 25

*Crane v. Kentucky*, 476 U.S. 683 (1986) . . . . . . . . . . . . . . . . . . . . . 39

*Greene v. Massey*, 437 U.S. 19 (1978) . . . . . . . . . . . . . . . . . . . . . . . . 15

*Guam v. Shymanovitz*, 157 F.3d 1154 (9th Cir. 1998) . . . . . . . . . . 37, 38

*Hart v. Gomez*, 174 F.3d 1067 (9th Cir. 1999) . . . . . . . . . . . . . . 20, 30, 32

*Idaho v. Wright*, 497 U.S. 805 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Jackson v. Virginia*, 43 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . 12

*Lord v. Wood*, 184 F.3d 1083 (9th Cir. 1999) . . . . . . . . . . . . . . 20, 30, 32

*Mullaney v. Wilbur*, 421 U.S. 684 (1975) . . . . . . . . . . . . . . . . . . . . . 12

*Sims v. Livesay*, 970 F.2d 1575 (6th Cir. 1992) . . . . . . . . . . . . . . 20, 25

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . passim

*United States v. Bess*, 593 F.2d 749 (6th Cir.1979) . . . . . . . . . . . . . . 57

*United States v. Carroll*, 26 F.3d 1380 (6th Cir.1994) . . . . . . . . . . . . . 57

*United States v. Krebs*, 788 F.2d 1166 (6th Cir.1986) . . . . . . . . . . . . . 57

*United States v. Molina*, 934 F.2d 1440 (9th Cir. 1991) . . . . . . . . . . . 56

*United States v. Necoechea*, 986 F.2d 1273 (9th Cir. 1993) . . . . . . . . . 57

*United States v. Ortiz*, 362  F.3d 1274 (9th Cir. 2004)  . . . . . . . . . . . . . 56

*United States v. Robinson*, 707 F.2d 872 (6th Cir. 1982)  . . . . . . . . . . . 35

*United States v. Tarricone*, 996 F.2d 1414 (2d Cir. 1993) . . . . . . . . 20, 25

## STATE CASES

*In re Christian S.*, 7 Cal. 4th 768 (1994)  . . . . . . . . . . . . . . . . . 13, 19, 45

*In re Cordero*, 46 Cal. 3d 161 (1988)  . . . . . . . . . . . . . . . . . . . . . . . 60

*In re Fields*, 51 Cal. 3d 1063 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re Sixto*, 48 Cal. 3d 1247 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*People v. Alverson*, 60 Cal. 2d 803 (1964) . . . . . . . . . . . . . . . . . . . . . 56

*People v. Barton*, 12 Cal. 4th 186 (1995) . . . . . . . . . . . . . . . . . . . . . . 14

*People v. Bland*, 28 Cal. 4th 313 (2002) . . . . . . . . . . . . . . . . . . . . . . . 13

*People v. Brady*, 190 Cal. App. 3d 124 (1987) . . . . . . . . . . . . . . . . . . 49

*People v.  Brown*, 225 Cal. App. 3d 585 (1990) . . . . . . . . . . . . . . . . . 35

*People v. Coleman*, 38 Cal. 3d 69 (1985) . . . . . . . . . . . . . . . . . . . . . . 47

*People v. Demery*, 104 Cal. App. 3d 548 (1980) . . . . . . . . . . . . . . . . . 34

*People v. Flynn*, 166 Cal. App. 2d 501 (1958)  . . . . . . . . . . . . . . . . . . 18

*People v. Fujita*, 43 Cal. App. 3d 454 (1974) . . . . . . . . . . . . . . . . . . . 36

*People v. Gardeley*, 14 Cal. 4th 605 (1996) . . . . . . . . . . . . . . . . . . . . 51

*People v. Gibson*, 56 Cal. App. 3d 119 (1976) . . . . . . . . . . . . . . . . . . 38

*People v. Haskett*, 30 Cal. 3d 841 (1982) . . . . . . . . . . . . . . . . . . . . . . 56

*People v. Humphrey*, 13 Cal. 4th 1073 (1996) . . . . . . . . . . . . . . . . . . . 13

*People v. Killebrew*, 103 Cal. App. 4th 644 (2002) . . . . . . . . . 47, 51, 52

*People v. Ledesma*, 43 Cal. 3d 171 (1987) . . . . . . . . . . . . . . . . . . . . . 60

*People v. Lee*, 31 Cal. 4th 613 (2003) . . . . . . . . . . . . . . . . . . 13, 19, 33

*People v. Martinez*, 188 Cal. App. 3d 19 (1986) . . . . . . . . . . . . . . . . 49

*People v. Miley*, 158 Cal. App. 3d 25 (1984) . . . . . . . . . . . . . . . . . . . 34

*People v. Montiel*, 5 Cal. 4th 877 (1993) . . . . . . . . . . . . . . . . . . . . . . 47

*People v. Randle*, 35 Cal. 4th 987 (2005) . . . . . . . . . . . . . . . 13, 14, 45

*People v. Rocha*, 3 Cal. 3d 893 (1971) . . . . . . . . . . . . . . . . . . . . . . . 17

*People v. Rodriguez*, 53 Cal. App. 4th 1250 (1997) . . . . . . . . . . . . . . 19

*People v. Swain*, 12 Cal. 4th 593 (1996) . . . . . . . . . . . . . . . . 13, 19, 33

*People v. Talle*, 111 Cal. App. 2d 650 (1952) . . . . . . . . . . . . . . . . . . 56

*People v. Valdez*, 58 Cal. App. 4th 494 (1997) . . . . . . . . . . . . . . . . . 51

*People v. Viramontes*, 93 Cal. App. 4th 1256 (2001) . . . . . . . . . . . . . 13

*People v. Von Villas*, 11 Cal. App. 4th 175 (1992) . . . . . . . . . . . . . . . 34

*People v. Williams*, 222 Cal. App. 3d 911 (1990) . . . . . . . . . . . . . . . 49

*Summers v. A. L. Gilbert Co.*, 69 Cal. App. 4th 1155 (1999) . . . . . . . . 52

## FEDERAL CONSTITUTION

Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**FEDERAL STATUTES**

28 U.S.C. § 2254. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**STATE STATUTES**

Cal. Evid. Code § 210 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Cal. Evid. Code § 350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Cal. Evid. Code § 351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Cal. Evid. Code § 801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 51

Cal. Evid. Code § 802 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Cal. Evid. Code § 805 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Cal. Evid. Code § 1101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Cal. Evid. Code § 1200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 50

Cal. Penal Code § 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 45

Cal. Penal Code § 186.22 . . . . . . . . . . . . . . . . . . . . . 2, 24, 25, 47, 50-52

Cal. Penal Code § 197 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 45

Cal. Penal Code § 198 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 45

Cal. Penal Code § 664/187 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12

1  FAY ARFA, A LAW CORPORATION
2  Fay Arfa, Attorney at Law
   State Bar # 100143
3  10100 Santa Monica Blvd., #300
4  Los Angeles, CA 90067
   Tel.: (310) 841-6805
5  Fax: (310) 841-0817
6
7  Attorney for Defendant
   TIMOTHY LEE DRIGGARS, JR.
8
               **IN THE UNITED STATES DISTRICT COURT**
9
10             **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
11
12 TIMOTHY LEE DRIGGARS, JR.,        )     No.
                                     )
13      **Petitioner,**              )     **MEMORANDUM  OF**
14                                   )     **P O I N T S   A N D**
                                     )     **AUTHORITIES   IN**
15      v.                           )     **SUPPORT  OF  PETITION**
                                     )     **FOR  WRIT  OF  HABEAS**
16 MIKE MCDONALD, Warden             )     **CORPUS BY A PERSON IN**
17                                   )     **STATE   CUSTODY**  (28
        **Respondent.**              )     U.S.C. § 2254.)
18      _____     )
19
20
21
22 Petitioner alleges:
23 1.    Petitioner TIMOTHY LEE DRIGGARS, JR.  (CDC No. V-43868)  is
24       unlawfully restrained of his liberty and imprisoned by Warden Mike
25
26       McDonald, at High Desert State Prison, in Susanville, CA.
27 2.    Warden McDonald purports to imprison Mr. Driggars by authority of
28

                                    1

and pursuant to a commitment rendered in the Orange County Superior Court. (Case No. 05CF0777.)

3. The prosecution charged Mr. Driggars with the crime of the first degree premeditated attempted murder of Mynor Mejia. ([Count 1] Cal. Penal Code §§ 664/187.)

4. The prosecution also alleged that Mr. Driggars committed the crime of street terrorism and that, during the commission of the attempted murder, Mr. Driggars personally discharged a gun, inflicted great bodily injury and committed the offense for the benefit of a criminal street gang. Cal. Penal Code §§ 664/187, 186.22 (a)(b), 12022.5, 12022.53 (d). (CT 128-130.)

5. On March 15, 2006, the jury found Mr. Driggars guilty of attempted murder, but found the premeditated murder allegation to be not true. The jury also found Mr. Driggars guilty of street terrorism and found the gun and gang enhancements to be true.  (CT 215-235.)

6. Mr. Driggars timely appealed his conviction.   He concurrently filed a petition for writ of habeas corpus.  The Court of Appeal consolidated the habeas petition and the appeal.  (Case Nos. G040341, G038726.)

7. Mr. Driggars raised the following issues in his consolidated appeal: (1) The Case Should Be Reversed Because the Evidence Failed to

Support the Attempted Murder Verdict; (2) The Case must Be Reversed Because Trial Counsel's Failure to Present Critical exculpatory Evidence of Mejia's Drug Use and a Drug Expert Deprived Appellant of the Effective Assistance of Trial Counsel; (3) The Case Should Be Reversed Because Trial Counsel's Failure to Present a Mental Health Expert Deprived  Appellant of the Effective Assistance of Trial Counsel; (4) The Case Should Be Reversed Because Trial Counsel's Failure to Present a Defense   Gang Expert Deprived  Appellant of the Effective Assistance of Trial Counsel; (5) The Case Should Be Reversed Because Trial Counsel's Failure to Present Appellant's Parole Officer to Corroborate Appellant's Desire to Remove His Tattoos Deprived  Appellant of the Effective Assistance of Trial Counsel; (6) The Case Should Be Reversed Because  Trial Counsel's Failure to Investigate, Obtain and Introduce Appellant's Medical Records Deprived  Appellant of the Effective Assistance of Trial Counsel; (7) The Case Should Be Reversed Because Trial Counsel Rendered Ineffective Assistance by Admitting the Transcript and Not the Tape of Appellant's Police Interview into Evidence; (8) The Case Should Be Reversed Because Trial Counsel Rendered Ineffective Assistance by Failing to Object to the Erroneous

Admission of Irrelevant and Prejudicial Evidence Consisting of a Ski Mask, Gloves and Rap Lyrics; (9) The Case Should Be Reversed Because the Trial Court Deprived  Appellant of the Right to Present a Defense by Unfairly Restricting Appellant's and His Grandmother's Testimony at Trial; (10) Trial Counsel's Failure to Challenge the Admission of the Prejudicial Hearsay Evidence Presented via the Gang Expert Deprived Appellant of the Effective Assistance of Counsel; (11) The Case Should Be Reversed Because the Trial Court Deprived Appellant of Due Process and a Fair Jury Trial by Admitting the Gang Expert's Testimony on the Ultimate Facts; (12) The Case Should Be Reversed Because the Prosecutor Committed Prejudicial Misconduct by Vouching for the Witnesses' Credibility; (13) The Cumulative Effect of the Errors Requires Reversal.

8.    On December 19, 2009, the Court of Appeal, Fourth Appellate District, Division Three (Case No.  G038726), affirmed Mr. Driggar's conviction.

9.    Mr. Driggars filed a Petition for Review in the California Supreme Court (Case No. S169943) raising the same issues that he raised in his direct appeal.

10.   On March 11, 2009, the California Supreme Court denied the petition

1    for review.  (Case No. S169943)

2        Mr. Driggars has no other plain, speedy, or adequate remedy at law,

3

4   and is without remedy except on application for writ of habeas corpus to

5   effect the immediate release and discharge to which he is constitutionally

6

7   entitled.  Attached are facts and arguments in support of this Petition for

8   Writ of Habeas Corpus.

9        Accordingly, petitioner prays for the Court to:

10

11   1.   Issue an Order to Show Cause to Respondent to inquire into the

12        legality of Petitioner's incarceration.

13
     2.   Direct Respondent to file with this Court a full and complete copy of
14
15        the record of the proceedings that occurred in the California Courts in

16        connection with this matter;

17
     3.   Grant petitioner leave to conduct such discovery as has been and
18
19        shall later be requested by petitioner upon a showing of good cause;

20   4.   Hold an evidentiary hearing.

21
     5.   Issue a writ of habeas corpus pursuant to 28 U.S.C. §2254 to have
22
23        Petitioner brought before it so that he may be discharged from his

24        unconstitutional confinement and restraint and to reverse his

25
          conviction; and
26
27   6.   Grant such other relief as may be appropriate and as law and justice

28

5

1    require.

2    DATED: November 30, 2009

3

4                                  Respectfully submitted,
                                    FAY ARFA, A LAW CORPORATION
5

6                                  By: /s/Fay Arfa
                                    FAY ARFA, ATTORNEY AT LAW
7                                  Attorney for Petitioner

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                             6

# VERIFICATION

STATE OF CALIFORNIA          )
                             )  ss.
COUNTY OF LOS ANGELES   )

I, Fay Arfa, am the attorney for the Petitioner in the proceeding.  I have read the petition and know the contents. The same is true of my knowledge, except as to those matters which are alleged on information and belief, and, as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on November 30, 2009 at Los Angeles, California.


Fay Arfa, Attorney at Law

7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## STATEMENT OF FACTS

### The Incident

On March 8, 2005, twenty seven-year-old Oscar Ramirez and his sixteen-year-old brother, Mynor Mejia,  were walking to the store to buy a soda in the Santa Ana territory claimed by the "Lopers" criminal street gang.  (RT 61-63.)

As they walked, they saw a white man driving in a car.  Ramirez believed he saw two white women in the car, but Mejia believed the two women passengers were Latin. (RT 68, 62-63, 95, 149-150.)  Petitioner, the driver, drove into the right lane, "mad dogged" them and then drove into the store's parking lot.  (RT 85, 110, 141, 133-135, 156.) Ramirez and Mejia arrived at the store. (RT 69, 97.)

As Ramirez and Mejia walked toward the store, petitioner, who remained in his car, asked Mejia to, "Come here." Mejia began to approach and then petitioner asked him whether he gang banged.  Mejia said, "I don't gang bang" or "I'm from nowhere." Mejia, who intended to fight petitioner, rolled up his sleeves. (RT 71, 112-115, 136, 142-145, 156-159, 162.)

Petitioner opened the car door and pulled out a gun. Ramirez had "hearing problems," however, Mejia heard petitioner call him [Mejia] a "Latin Bitch." Petitioner then shot Mejia. After being shot, Mejia said, "Fuck you" and "flipped off" petitioner and then entered the store.  (RT 72-75, 93, 112-116, 135, 154-158.)  Petitioner drove away. (RT 89, 115.)

A police officer found petitioner with the two women at a gas station located a  few blocks away. The officer arrested petitioner. (RT 169-171.)

The police later found a loaded gun, whose casings matched the bullet used to shoot Mejia, in the speaker of petitioner's car. Although

petitioner had urinated on his hands to remove any gunshot residue, the police found gunshot residue on petitioner's hands.  (CT 136; RT 175-176, 184-189, 568-570.)  The police also found various letters and writings in the trunk of petitioner's car.  (RT 190, 205-208, 231.)

**The Gang Evidence**

Prosecution gang expert, Kevin Ruiz testified that petitioner had several gang related tattoos on his body, including his head.  (RT 181-184, 232-236.)  Ruiz also explained the gang culture including how members get jumped into gangs, the "where are you from?" challenge, and the territory or "turf" claimed by the gang.  (RT 194-198.)  Ruiz also testified about the history of the Lopers gang. According to Ruiz, Lopers gang members commit crimes ranging from murder, to robbery, to auto theft.  (RT 202-204.)

Ruiz, testifying from field interview ("FI") cards and other police documents, including police reports, detailed all the police contacts showing petitioner's Lopers affiliation.  (RT 219-228.)  He also testified that the belt, a calendar, and letters found in petitioner's car all were consistent with gang activity and gang affiliation. (RT 232-241; Trial Exhs. 12, 13.)

According to Ruiz, Lopers gang member Nunez had been convicted of robbery and Lopers gang member Zamorando had been convicted of auto theft. Both Nunez and Zamorando had admitted they actively participated in the Lopers gang.  (RT 218-219, 692-694; Trial Exhs. 16, 20.)

Ruiz opined that petitioner willfully shot Mejia to promote, further, or assist a criminal street gang.  Ruiz also testified that petitioner shot Mejia for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal

9

conduct by gang members. (RT 238-243.)

## Defense Case

### The Incident

Petitioner testified that, just six days before the March 8, 2005 incident, he had been walking from a store in Hollywood, when some La Mirada gang members shot him. Afterwards, afraid for his life, he bought a gun for self-protection. (RT 459-461, 556-559, 618.)

On March 8, 2005, at about 1:30 p.m., petitioner, his pregnant girlfriend Claudia and her younger sister Selene drove to petitioner's grandmother's house in Mission Viejo where they went swimming.  They left about 4:30 p.m. to go back to Hollywood where petitioner lived with Claudia and her family. (RT 306-308, 367-369, 441-446.)

They decided to get off the freeway and get buy gas. (RT 400.)  On the way to the gas station, petitioner stopped at Penguin's, petitioner's lifelong friend's house, to get money to buy for gas.  (RT 446-448, 506-509.) At about 6:30 p.m.,  they stopped at a store to buy a drink. Petitioner parked his car and, as he spoke to Claudia, two men approached aggressively and asked him where he was from.  He did not respond.  (RT 309, 313, 317-319, 330-332, 372-375, 452-457.)

The two men got about 14 feet next to his car.  One of them said, "Latin Boys" or "Latin Kings." One man put his hands in his pocket and the other man appeared to be pulling up his sleeve. Petitioner, who feared for his life, the life of his girlfriend, her sister and his unborn child, pulled out the gun that he kept hidden in the car door speaker. He fired once and left. (RT 319-320, 454-455, 565, 581-586.)

The two men ran away.  (RT 302, 458.)

The police arrested petitioner at a nearby gas station. (RT 465, 568.)

10

**The Gang Evidence**

Petitioner's mother and stepfather had belonged to the Lopers gang. As a result, at 12 years old, petitioner a.k.a. "Huero" joined the gang and became an active Lopers gang member until 2004. During that time, petitioner got several tattoos. Petitioner had served time in custody for assault and, after his release in 2004, he began to disassociate himself from the gang. He moved away from the Lopers territory, stopped talking to gang members, worked at two jobs, and spoke to his parole officer about removing his tattoos. (RT 467-469, 492-497, 532-535, 543.)

Petitioner denied that, at the time of the incident, he was an active gang member or that he committed the crime for the benefit of the gang. (RT 461.) His girlfriend Claudia gave him a belt with the letter "C" for "Claudia." (RT 357-358.) He wrote the lyrics found in the car because he wanted to write and publish rap songs. Rap artist Snoop Doggie Dog actually wrote some of the lyrics. (RT 498-501, 610-611.)

Petitioner denied that any gang member would commit a crime against a civilian. An offense against a civilian would constitute a "green light" offense and that person would be subject to retaliation from the gang. (RT 469-470.)

On December 25, 2005, because he renounced his gang membership, some men in jail attacked him with a razor, sending him to the hospital. (RT 462-464, 588-589.)

After the incident, the police interviewed petitioner twice. Originally, petitioner denied shooting anyone. The next day, afraid that the police would criminally charge Claudia and Selene, petitioner admitted that he shot Mejia. (RT 471-471, 666-668.)

11

**ARGUMENT**

I. **HABEAS RELIEF SHOULD BE GRANTED BECAUSE THE EVIDENCE FAILED TO SUPPORT THE ATTEMPTED MURDER VERDICT**

A. **Introduction**

The jury convicted petitioner of attempted murder.  Cal. Penal Code § 664/187. Attempted murder requires the perpetrator to specifically intend to kill.  The evidence fails to show that defendant petitioner specifically intended to kill Mejia; the evidence showed that petitioner acted in self-defense and the defense of others. Therefore, the evidence failed to support the verdict.

B. **Standard of Review**

To guarantee the fundamental protection of due process of law, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 43 U.S. 307, 319, 61 L.Ed.2d 560, 99 S.Ct. 2781 (1979). "The question whether a defendant has been convicted upon inadequate evidence is central to the basic question of guilt or innocence." *Jackson* at 323.

The constitutional necessity of proof beyond a reasonable doubt is not confined to those defendants who are morally blameless.  See, *Mullaney v. Wilbur,* 421 U.S. 684, 697-698; 95 S. Ct. 1881, 1888-889; 44 L. Ed. 2d 508 (1975) ["Requirement of proof beyond a reasonable doubt is not 'limit[ed] to those facts which, if no proved, would wholly exonerate' the accused."].

### C.   Attempted Murder Requires the Specific Intent to Kill

"The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice--a conscious disregard for life--suffices. *People v. Lasko*, 23 Cal.4th 101, 107 (2000)." *People v. Bland,* 28 Cal.4th 313, 327 (2002). In contrast, "[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." *People v. Lee,* 31 Cal.4th 613, 623 (2003); see *People v. Swain,* 12 Cal.4th 593, 604-605 (1996).

### 1.   Self-Defense and Defense of Others

### a.   Self-Defense

"Self-defense is perfect or imperfect. For perfect self-defense, one must actually and reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury. [Citation.] A killing committed in perfect self-defense is neither murder nor manslaughter; it is justifiable homicide. [Citations.]" *People v. Randle*, 35 Cal.4th  987, 994 (2005). In such a case, the actor is completely exonerated. *People v. Humphrey,* 13 Cal.4th 1073, 1082 (1996).

"Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant actually, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." *In re Christian S.,* 7 Cal.4th 768, 771 (1994), italics omitted.

Facts giving rise to the claim of perfect self-defense may support imperfect self-defense. E.g., *People v. Viramontes*, 93 Cal.App.4th 1256,

1263  (2001) [two guns fired; jury could find victim fired first shot at
defendant]; *People v. Barton,*  12 Cal.4th 186, 202 (1995) [defendant
testified victim attacked him with a knife, no knife was found, jury could still
find defendant unreasonably believed victim armed because defendant's
judgment was clouded with anger].

### b.   Defense of Others

The defense of others theory protects a defendant from criminal
liability if he or she acts out of a reasonable fear of imminent danger of
great bodily injury to a third party. Cal. Penal Code §§ 3, 197,  198.
Imperfect defense of others also is a valid defense: "one who kills in
imperfect defense of others-in the actual but unreasonable belief he must
defend another from imminent danger of death or great bodily injury-is
guilty only of manslaughter." *People v. Randle,*  35 Cal.4th at 997.

### D.   The Evidence Shows Petitioner Either Not Guilty or Guilty of Attempted Voluntary Manslaughter

Petitioner had himself, just six days before the offense, been the
victim of a shooting.  (RT 459-461, 556-559, 618.) At the time of the Mejia
shooting, he honestly believed he was in imminent peril from Mejia's
potential attack.  At trial, Mejia admitted that he saw petitioner with two
Latin women.  (RT 68, 62-63, 95, 149-150.)  Mejia also continued to walk
to the store after petitioner "mad dogged" him and petitioner parked at the
store.  (RT 85, 110, 141, 133-135, 156.)

Mejia also admitted that he intended to fight petitioner and rolled up
his sleeves. (RT 71, 112-115, 136, 142-145, 156-159, 162.) Only then did
petitioner fire the gun. (RT 72-75, 93, 112-116, 135, 154-158.) After being
shot, Mejia showed his defiant attitude and said, "Fuck you" and "flipped
off" petitioner. (RT 72-75, 93, 112-116, 135, 154-158.)

14

1   The evidence showed that petitioner acted in self-defense and in the
2   defense of others.  He had a reasonable belief, based on Mejia's actions,
3   that Mejia was going to kill either him or his pregnant wife and girlfriend.  In
4   any event, petitioner acted in imperfect self defense and defense of others.
5   Therefore, the evidence failed to support the verdict and the charges
6   dismissed or reduced to voluntary manslaughter.  *Burks* v. *U.S.*,   437 U.S.
7   1, 18 [98 S.Ct. 2141;  57 L.Ed.2d 1] (1978);  *Greene* v. *Massey,* 437 U.S.
8   19, 25 [98 S.Ct. 2151;  57 L.Ed.2d 15] (1978).

9   **II.   HABEAS RELIEF SHOULD BE GRANTED BECAUSE TRIAL**
10  **COUNSEL'S FAILURE TO PRESENT CRITICAL**
11  **EXCULPATORY EVIDENCE OF MEJIA'S DRUG USE AND A**
**DRUG EXPERT DEPRIVED PETITIONER OF THE**
12  **EFFECTIVE ASSISTANCE OF TRIAL COUNSEL**

13  **A.   Introduction**
14
15  The prosecution discovery, in particular Mejia's medical records,
    showed that Mejia had been under the influence of marijuana at the time of
16
    the offense.  His medical records showed that Mejia tested positive for TLC
17
18  also known as marijuana or cannabis.  (CT 370, 371; Exh.  A at 1.)
19  Nevertheless, the hospital records showed that, when asked by a social
    worker about his marijuana use, Mejia denied ever using marijuana before.
20
21  (CT 371; Exh.  A at 2.) Trial counsel had evidence, in the form of an
22  investigative report, that Mejia had regularly used marijuana.  (CT 372;
23  Exh.  A at 3-4.)

24  The marijuana evidence would have undermined the prosecution's
25  case by showing that Mejia's perceptions of the incident were diminished
26  because of his marijuana use.  The marijuana evidence also showed that
27  Mejia lied to his doctors about his marijuana use.  The jury had to decide
28  whether to believe Ramirez and/or Mejia.  Yet, trial counsel failed to elicit

information about Mejia's marijuana use and the effect of the marijuana use on Mejia's perceptions.  The failure deprived petitioner of the effective assistance of trial counsel. *Strickland v. Washington*, 466 U.S. 668, 687 [80 L. Ed. 2d 674, 104 S. Ct. 2052](1984).

Therefore, relief should be granted. [1]

**B.    The Constitution Guarantees a Criminal Defendant the Right to the Effective Assistance of Counsel and the Right to Present a Defense**

The United States Supreme Court has held that a defendant is entitled to present evidence in support of a relevant defense. *California v. Trombetta,* 467 U.S. 479, 485, 81 L. Ed. 2d 413 (1984); *Chambers v. Mississippi,* 410 U.S. 284, 302, 35 L. Ed. 2d 297 (1973).  Furthermore, criminal defendants have the right to counsel guaranteed by the Sixth Amendment to the United States Constitution and article I, § 15 of the California Constitution. See also, *Strickland* v. *Washington,*   466 U.S. at 687.

**C.    Trial Counsel Rendered Ineffective Assistance by Failing to Present Evidence of Mejia's Drug Use and a Drug Expert**

Mejia's medical records show that, while hospitalized on March 8, 2005, he tested positive for THC.  (CT 370-372; Exh. A at 1-2.) .) The March 9, 2005 "Social Services Progress Notes" from the hospital show that a social worker spoke to Mejia about testing positive for THC. According to the social worker, Mejia was "appropriately scared about

---

[1]Counsel for petitioner raised many of the ineffective assistance of counsel issues in a Motion for New Trial.  Counsel for petitioner subpoenaed trial counsel to the hearing on the Motion for New Trial.  Trial counsel failed to appear.  (CT 447-449; Exh. J.) The trial court denied the Motion for New Trial. (CT 519.)

16

testing positive for the THC.  The patient stated it was his first time . . . "
(CT 372; Exh. A at 2.) Trial counsel failed to elicit the critical exculpatory
fact that Mejia was on drugs at the time of the shooting.

Furthermore, trial counsel had information that another witness,
Javier Garcia, Mejia's landlord, believed that Mejia smoked marijuana.  An
October 13, 2005 report shows that Garcia told a defense investigator that
he believed that Mejia smoked marijuana and that he [the investigator]
could find evidence of smoking marijuana on the front porch.  (CT 372;
Exh. A at 3-4.)

Trial counsel failed to present evidence of Mejia's drug use and an
expert to substantiate the use of such drug use on Mejia's credibility. See,
*People v. Rocha*, 3 Cal.3d 893, 901 (1971) [Evidence of drug use
admissible for impeachment purposes if expert testimony substantiates the
effects of such drug use on credibility].

THC "is the main psychoactive substance found in the plants of the
sativa species Cannabis L" (CT 376;  Exh. B.) According to Robert C. Daly,
a Senior Fellow at the National Institute of Mental Health,  the following
symptoms may be prominent in acute intoxication: euphoria, relaxation,
subjective feelings of well-being or grandiosity, perceptual changes
(including visual distortions), drowsiness and sluggishness, diminished
coordination, paradoxical hyperalertness,  feelings of panic, disorientation
and memory impairment, paranoia, altered perceptions manifesting as
illusions or frank visual hallucinations, and psychotic episodes.
Significantly, "Cannabis intoxication may be associated with dysphoric,
irritable, or aggressive mood changes.  Carefully examine patients for
evidence of suidicality and homicidality . . . " (CT 378-379; Exh. B, pp 4-5.)

Mejia's drug use was inextricably intertwined with the reasons he

17

engaged in aggressive behavior toward petitioner.  Mejia's drug use explained Mejia's propensity for violence evidence and proved petitioner's perceived fear of him (his state of mind) at the time of the incident.

The effects of smoking marijuana include dryness of the throat and mouth, hunger, "light-headedness or, as they say, high," abnormal behavior, thirst, then "(a)s he comes down" a feeling of depression.  See *People v. Flynn,* 166 Cal.App.2d 501, 506 (1958).

Trial counsel should have elicited evidence of Mejia's drug use. Mejia's drug use diminished his ability to perceive what happened to him. The marijuana evidence also showed that Mejia lied to his social worker when he claimed he had just used marijuana for the first time.

The jury had to decide whether to believe petitioner and/or Ramirez and Mejia.   Trial counsel's failure to elicit information about Mejia's drug use and how it affected his perceptions deprived petitioner of his constitutional rights to the effective assistance of trial counsel, due process and a fair trial  under th Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth Amendment. See also, *Strickland* v. *Washington,*   466 U.S.  at 687.

Therefore, relief should be granted.

/ / /

/ / /

/ / /

18

III. **HABEAS RELIEF SHOULD BE GRANTED BECAUSE TRIAL COUNSEL'S FAILURE TO PRESENT A MENTAL HEALTH EXPERT DEPRIVED PETITIONER OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL**

A. **Introduction**

Petitioner's mental state constituted a critical issue in the case. The crime of attempted murder required a certain mental state, namely the specific intent to do the act. *People v. Lee,* 31 Cal.4th at 623; see *People v. Swain,* 12 Cal.4th at 604-605. The evidence showed, and the jury could have found, that petitioner actually, and reasonably or unreasonably believed in the need to resort to self-defense to protect himself from imminent peril. *In re Christian S.,* 7 Cal.4th at 773, 783; *People v. Rodriguez,* 53 Cal.App.4th 1250, 1270 (1997).

Petitioner perceived that Mejia and Ramirez wanted to kill him, his pregnant girlfriend, and/or her sister. A forensic psychologist would have explained that petitioner suffered from the psychological effects of his prior gunshot wound when he committed the incident. The law required trial counsel to investigate the possibility of presenting a mental health expert to testify about the psychological effects of petitioner's recent trauma on his state of mind.

Trial counsel failed to retain any psychological expert to examine petitioner or to testify at trial about the effects of posttraumatic stress on petitioner's perceptions and behavior. Therefore, petitioner was deprived of the effective assistance of counsel because a psychological expert would have shown that petitioner lacked the requisite mental state.

Therefore, relief should be granted.

19

**B.    The Constitution Guarantees a Criminal Defendant the Right to the Effective Assistance of Counsel and the Right to Present a Defense**

A defendant is entitled to present evidence in support of a relevant defense. *California v. Trombetta*,   467 U.S. at 485; *Chambers v. Mississippi,*  410 U.S. at 284, 302.  Criminal defendants have the right to counsel guaranteed by the Sixth Amendment to the United States Constitution and article I, § 15 of the California Constitution. See also, *Strickland* v. *Washington,*   466 U.S.  at 687.

A "lawyer who fails adequately to investigate, and to introduce into evidence, [evidence] that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question  to undermine confidence in the verdict, renders deficient performance." *Hart v. Gomez,*  174 F.3d 1067, 1070 (9th Cir. 1999) [finding defense counsel's performance deficient because he failed to review or introduce at trial documents corroborating defense witness's testimony]; see also *Lord v. Wood*, 184 F.3d 1083, 1096 (9th Cir. 1999) [defense counsel's performance deficient because he failed to interview or call at trial witnesses who had told police and investigators that they saw the victim alive a day after the defendant allegedly killed her].

The failure to call an expert witness can be grounds for a successful ineffective assistance of counsel claim. See, *United States v. Tarricone* 996 F.2d 1414 (2d Cir. 1993) [failure to call handwriting expert]; *Sims v. Livesay,* 970 F.2d 1575 (6th Cir. 1992) [failure to present gunshot expert].

**C.    Trial Counsel's Failure to Retain a Psychologist to Testify on Petitioner's Behalf Constituted Ineffective Assistance**

Trial counsel failed retain a mental health professional to evaluate and testify for petitioner. Jody A. Ward, a psychologist, would have testified that several factors influenced petitioner's perceptions and  behavior at the time of the offense.  (CT 387-391; Exh. C.)

At trial,  petitioner testified that he had been "hit up" several times before the incident. He told the gang members, who he believed "hit him up"  that he was no longer involved in a gang and that his previous gang was in Orange County.  Shortly later, and six days before the March 8, 2005 incident, someone shot him in the leg. Petitioner bought a loaded gun after the incident to protect himself.  (CT 388; Exh. C at 2.)

Petitioner testified that Mejia and another man approached him aggressively and asked him "where he was from." Petitioner also heard the men yelling "Latin Boys," a known Orange County gang.  Petitioner saw one of the men pulling up his sleeve in an aggressive matter.  At that point, petitioner reached into his car and pulled out a gun from behind a stereo speaker.  While still sitting, he shot the gun in the direction of the men, wounding one of them in the stomach.  (CT 388; Exh. C at 2.)

Petitioner also testified that he experienced much violence as a result of renouncing membership in the Lopers gang.  While in jail awaiting trial for this offense, he was severely cut with a razor blade on his head, arms, back of the neck and his jawline.  His Orange County Jail request for medical attention stated he was attacked with a razor and received nine lacerations. (CT 388; Exh. C at 2-3.)

Dr. Ward would have testified that, based on the violence  petitioner experienced just six days before the event, petitioner would have been

21

experiencing posttraumatic stress reactions which could have contributed to an overreaction to the threat that the other men posed to him in the parking lot.  (CT 389; Exh. C at 2-3.)

Dr. Ward would have testified that there is "strong evidence that most people who are recently exposed to a traumatic experience show a broad array of posttraumatic stress reactions in the initial weeks after trauma." She would have also testified that research has shown that an exaggerated startle response has been recognized as a core symptom of posttrauma reaction since the earliest descriptions of posttraumatic stress, and it is one of the most reliably reported symptoms following a traumatic event. (CT 389; Exh. C at 3.)

Dr. Ward would have testified that the exaggerated startle response is a central element of posttraumatic symptoms, and is also related to other hyperarousal symptoms.  The exaggerated startle response is one of the first symptoms to emerge following trauma exposure and is related to the hypervigilance often reported after a traumatic event. (CT 389; Exh. C at 4.)

Dr. Ward would also have testified that hypervigilance and hyperarousal are very common post-traumatic symptoms.  In extreme states of hypervigilance, the person filters his or her perceptions of the environment through a screen of the trauma experience.  Perception and information processing are then filtered through the individual trauma encounter, which sifts out irrelevant information and focuses attention on actions of others or in the environment with the highest potential for danger and threat. (CT 389-390; Exh. C at 3-4.)

According to Dr. Ward, hypervigilance is a biologically conditioned response to the trauma and is strongly reinforced by the survival of that

22

event. "Thus, [posttraumatic] hypervigilance is an automatic, psychologiologically determined response pattern designed to adapt to the perception, or the existence of, threat to the well being of the organism . . . However, extreme hyperarousal may result in misperception of cues and lead to maladaptive responses, including those with potential legal consequences." (CT 390.)

Significantly, Dr. Ward would have opined that, based on her training, experience, research in the area of posttraumatic stress, and her review of petitioner's trial transcripts, that petitioner likely was experiencing the exaggerated startle response, hypervigilance, and hyperarousal, which characterizes posttraumatic symptomology, when he shot at the Hispanic men in the parking lot.  (CT 390; Exh. C at 4.)

Dr. Ward would have opined that petitioner likely could have overreacted to the threat of the two men or misinterpreted the event based on his hypervigilance and hyperarousal, very common manifestations of posttraumatic stress.  His testimony also showed that he had reason to fear his own gang members, because he was cut while in jail on his head, neck, and arms because he renounced his gang membership. [2](CT 390-391; Exh. C at 4-5.)

Even though petitioner's state of mind had been placed into issue, trial counsel failed to present any mental health professional.  The jury needed a mental health expert to understand why a shooting that occurred

---

[2]     Dr. Ward also opines that petitioner would have benefitted from a psychological evaluation to determine whether he was experiencing posttraumatic symptoms which contributed to his perceptions and behavior at the time of the offense. (CT 288; Exh. C at 2.) On December 1, 2006, the trial court denied counsel's request for a psychiatric examination at county expense.   (CT 288.)

six days before would have caused petitioner to believe he needed to act in self defense. The jury needed an expert to understand how petitioner's mind worked and why petitioner needed to defend himself and the others. Without such an expert, the jury could not have understood petitioner's need to shoot Mejia.

Therefore, petitioner was denied his state and federal constitutional rights to the effective assistance of trial counsel, due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth Amendment. See also, *Strickland* v. Washington, 466 U.S. at 687. Relief should be granted.

## IV. HABEAS RELIEF SHOULD BE GRANTED BECAUSE TRIAL COUNSEL'S FAILURE TO PRESENT A DEFENSE GANG EXPERT DEPRIVED PETITIONER OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL

### A. Introduction

The prosecution presented a gang expert, namely, Kevin Ruiz, to testify about the Lopers' gang and to opine that petitioner willfully shot Mejia to promote, further, or assist a criminal street gang. Ruiz also testified that petitioner shot Mejia for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. (RT 238-243.) Cal. Penal Code § 186.22 (a)(b).

Defense counsel failed to present any gang expert to opine that the incident involving petitioner and Mejia had nothing to do with gangs. As a result, petitioner was denied his state and federal constitutional rights to the effective assistance of trial counsel, due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment

24

under the Eighth Amendment. See also, *Strickland* v. *Washington,*   466 U.S. at 687.

Therefore, relief should be granted.

**B.     The Constitution Guarantees a Criminal Defendant the Right to the Effective Assistance of Counsel and the Right to Present a Defense**

A defendant is entitled to present evidence in support of a relevant defense. *California v. Trombetta,* 467 U.S.  485; *Chambers v. Mississippi,* 410 U.S.  284, 302.  Criminal defendants have the right to counsel guaranteed by the Sixth Amendment to the United States Constitution and the California Constitution. See also, *Strickland* v. *Washington,*   466 U.S. at 687.

The failure to call an expert witness can be grounds for a successful ineffective assistance of counsel claim. See, *United States v. Tarricone,* 996 F.2d 1414; *Sims v. Livesay,*   970 F.2d at 1580-81.

**C.     Trial Counsel's Failure to Present a Defense Gang Expert Denied Defendant the Right to the Effective Assistance of Counsel**

Ruiz testified that petitioner committed the crime for the benefit of the gang.  As a result, the jury found that petitioner committed the offenses for the benefit of and to promote the gang.  (RT 238-243.) Cal. Penal Code § 186.22 (a)(b).  The gang enhancement as to the premeditated, attempted murder charge itself would have prohibited parole until at least 15 years in prison had been served.  Cal. Penal Code § 186.22 (c)(5).

The defense theorized that Ramirez and Mejia saw a white boy in Mexican gang territory, an area where "white boys don't belong."  (RT 800.) Defense counsel argued, " . . .  [T]he victim, Mr. Mejia, Mr. Martinez [sic] see a white boy with two Latin girls in a Latin area.  They are obviously

1    going to get into an argument, or a fight or whatever." (RT 802.)

2         The defense argued, "My theory of the case is these young men saw

3    a white boy with two girls. As they got closer, they became aware that they

4    were Latin girls, they got angry . . .  " (RT 808.) Trial counsel's argument to

5    the jury lacked solid evidentiary support, particularly in light of Ruiz'

6    testimony.  A gang expert, namely Dr. Lopez,  would have countered Ruiz'

7    conclusions and shown the jury that the offense was not gang related and

8    that the lyrics were simply expressions of contemporary pop culture.  (CT

9    397-398; Exh. D at 3-4.)

10        Gang expert Dr. Lopez  would have testified that the evidence

11   showed that before March 8, 2005, petitioner wanted to leave the gang.

12   Petitioner moved from Santa Ana to North Hollywood where he lived with

13   his pregnant girlfriend.  He became gainfully employed. He talked to his

14   parole officer about leaving the gang and removing his tattoos. (CT 396;

15   RT 467-469, 492-497, 532-535, 543; Exh. D at 2.)

16        Dr. Lopez would also have opined that, based on the evidence,

17   petitioner  started carrying a gun for his personal protection.  Dr. Lopez

18   would have based his opinion on various facts presented at trial.  Dr.

19   Lopez would have testified that he believed petitioner carried the gun

20   because on December 26, 2005,  petitioner, a young white man raised

21   within the Latino community Santa Ana, was shot for no apparent reason in

22   North Hollywood, CA. Petitioner was scared for his life. He bought the gun

23   to protect himself  from another similar attack that might kill him or from the

24   original perpetrators who might return to kill him. (CT 396; Exh. D at 2.)

25        Dr. Lopez would have also testified that petitioner did not willfully

26   shoot Mejia to promote, further, or assist any gang.  Similarly, according to

27   Dr. Lopez, petitioner did not engage in the incident for the benefit of, at the

28

26

direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. (CT 397; Exh. D at 3.)

Dr. Lopez would have testified that the incident resulted from Latino cultural mores and perceptions.  According to Dr. Lopez, the Latino male chauvinist image originated with the Spaniards in  Mediterranean Spain. The Latino male chauvinism requires the Latino men to protect the honor of their women.  According to the Latino male chauvinistic culture, their women must be sexually pure. In Dr. Lopez' opinion, a white man with two Hispanic women poses a threat to the purity of the Hispanic women.  The white man must be punished and taught a lesson.  (CT 397; Exh. D at 3.)

The trial facts showed that, on March 8, 2005, petitioner, who was with his pregnant girlfriend and sister, stopped to buy a drink. In Dr. Lopez' opinion, and consistent with the male chauvinistic Spanish code of honor, two Latino men approached and began to aggressively mad-dog petitioner. The aggressive maddogging behavior was designed to send a message to petitioner to "stay away from our women."   (CT 397; Exh. D at 3.)

Petitioner perceived the men as approaching him aggressively. He responded by meeting honor with honor and, in light of his previous shooting, spontaneously grabbed the gun that he had hidden in the car. He fired the gun to protect himself and his women.   The shooting resulted not for gang reasons, but for cultural, chauvinistic reasons. (See, CT 397-398; Exh. D at 3-4.)

Furthermore, Dr. Lopez would have opined that the attack on petitioner in jail resulted from his [petitioner's] expressed desire to leave the gang. According to Dr. Lopez, several homies in jail, consistent with "jumping out," attacked petitioner and cut him in the face to send a

27

1   message.  The cutting of petitioner's face left him a marked man.  The

2   resulting "scarlet letter" is taken with him to any prison that he goes and he

3   will carry the sentence of a "green light." This means that any inmate who

4   is armed is encouraged to attack him. Consequently, the Orange County

5   jail housed him in protective custody.  (CT 397; Exh. D at 3.)

6         Importantly, Dr. Lopez's testimony would have greatly changed the

7   prosecution perspective about the rap lyrics found in petitioner's car.  (Trial

8   Exh. 12.) Dr. Lopez would have opined that Driggers did not willfully

9   possess the lyrics with the intent to promote, further, or assist any gang.

10  Similarly,  petitioner did not possess the lyrics for the benefit of, at the

11  direction of, or in association with any criminal street gang, with the specific

12  intent to promote, further, or assist in any criminal conduct by gang

13  members.   (CT 398; Exh. D at 3.)

14        In Dr. Lopez' opinion, the lyrics were nothing more than the

15  exportation of gang culture to the general public.  Dr. Lopez would have

16  explained to the jury that, in recent years gang lyrics have become part of

17  rap music. The wearing of gang clothing, the listening to and writing of

18  gang lyrics and other expressions of gang characteristics have moved into

19  the mainstream of American pop culture.  Gang lyrics have become part of

20  rap music.  (CT 398; Exh. D at 4.)

21        Dr. Lopez would have testified that young people without any gang

22  affiliation whatsoever, listen to, write and enjoy gang and rap lyrics.

23  Similarly, people without any gang affiliation actively create the gang pop

24  culture. Dr. Lopez would have opined that the cultural lines between gang

25  and rap music have become totally blurred and the two are totally

26  indistinguishable. (CT 398; Exh. D at 4.)

27        In fact, Al Valdez, Chief Gang Investigator, for the Orange County

28

28

District Attorney's office, agrees with Dr. Lopez' view.  Valdez writes in his book, *Gangs: A Guide to Understanding Street Gangs,* 3rd Ed. (1997-2000) on page 9: "What was exported throughout the county between 1989 and 1999 was the gang culture.  This was done with the help of the music and movie industry and through the written and video media." (CT 398; Exh. D at 4.)

The defense gang expert's testimony would have seriously undermined the gang enhancements because the prosecution relied heavily on the gang evidence and the lyrics to convict petitioner.  (RT 759-763,814-815.) For example, the prosecutor argued, "But it's hard to say you are not still an active participant in the gang, and didn't premeditate and deliberate and shoot someone there in this area, and you write these lyrics, no matter when you wrote them, and you carry them around in your car with you, lyrics talking about murdering and killing people."  (RT 821)

The facts required trial counsel to call a defense gang expert.  Trial counsel failed to do so even though such an expert would have testified consistent with the defense theory.  Therefore, trial counsel's failure to call a defense gang expert deprived petitioner of his state and federal constitutional rights to the effective assistance of trial counsel, due process and a fair trial  under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth Amendment. See also, *Strickland* v. *Washington,*   466 U.S. at 687.

Relief should be granted.

**V.   HABEAS RELIEF SHOULD BE GRANTED BECAUSE TRIAL COUNSEL'S FAILURE TO PRESENT PETITIONER'S PAROLE OFFICER TO CORROBORATE PETITIONER'S DESIRE TO REMOVE HIS TATTOOS DEPRIVED PETITIONER OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL**

**A.   Introduction**

Petitioner was denied his Sixth and Fourteenth Amendment right to effective assistance of trial counsel. Trial counsel failed to contact and present petitioner's parole officer. Petitioner's parole officer would have provided exculpatory evidence, namely that petitioner wanted to distance himself from the gang and one of the steps he took was to seek assistance in removing his tattoos. (CT 400-401; Exh. E at 1-2.) *Strickland,* 466 U.S. at 684-685. Relief should be granted.

**B.   The Right to the Effective Assistance of Counsel Requires an Attorney to Investigate the Case and Present a Defense**

A "lawyer who fails adequately to investigate, and to introduce into evidence, [evidence] that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *Hart v. Gomez,* 174 F.3d 1070; see also *Lord v. Wood,* 184 F.3d at 1096.

**C.   Trial Counsel's Failure to Adequately Investigate Petitioner's Case and Present His Parole Officer Deprived Petitioner of the Effective Assistance of Counsel**

Petitioner testified at trial that he wanted to leave the gang. He moved away from the area, he stopped communicating with gang members, he also spoke to his parole officer about removing his tattoos. (Exh. E at 1-2 .) He had been gainfully employed on March 8, 2005. (RT 467-469, 492-497, 532-535, 543.) Petitioner's parole officer would have

30

corroborated petitioner's desire to remove his tattoos.  Petitioner's parole agent, Jessica Latumeten, supervised petitioner's parole.  On February 22, 2005, at 8:30 a.m., during a home visit, petitioner spoke to her about removing his tattoos.  (CT 400-401; Exh. E at 1-2.)

The prosecution relied heavily on the tattoos to prove petitioner's membership in the Lopers gang. Prosecution gang expert, Ruiz testified that petitioner had several gang related tattoos on his body, including his head.  (RT 134-135, 184-185.) The prosecutor highlighted petitioner's tattoos during her closing argument.  She argued, in part, "You know he [petitioner] tattooed up his body.  The last tattoo he told you he got was in 2004.  This shooting happened early 2005.  He tattooed his head. You saw the pictures all over his body."  (RT 759; see also RT 760.)

Petitioner tried to persuade the jury to believe that he wanted to sever his affiliation with the Lopers gang.  Petitioner's parole officer would have shown that petitioner really wanted to remove his tattoos and sever his ties to any gang.  Petitioner could not persuade the jury about his desire to leave the gang without the corroborating testimony of his parole officer.

Therefore, trial counsel's failure to present petitioner's parole officer deprived petitioner of the effective assistance of trial counsel, due process and a fair trial  under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth Amendment. See also, *Strickland* v. *Washington*,   466 U.S. at  687. Relief should be granted.

31

VI.   **HABEAS RELIEF SHOULD BE GRANTED BECAUSE TRIAL COUNSEL'S FAILURE TO INVESTIGATE, OBTAIN AND INTRODUCE PETITIONER'S MEDICAL RECORDS DEPRIVED  PETITIONER OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL**

A.   **Introduction**

Petitioner's physical state constituted a critical issue in the case because  Petitioner testified that a few days before the incident, some gang members shot him.   The unprovoked shooting prompted petitioner to buy a gun.  (RT 459-461, 556-559, 618.) The defense theorized that the prior shooting precipitated petitioner's actions during the incident. Petitioner's medical records corroborated his testimony that he had been shot and that he sought medical attention. (CT 404-406; Exh. F at 1-3.) The medical records also corroborated petitioner's testimony that he had been brutally attacked in jail. (CT 407-410; Exh. F at 4-7.)

Trial counsel failed to present the medical records.  The failure to present the medical records constituted ineffective assistance. Therefore, relief should be granted.

B.   **The Right to the Effective Assistance of Counsel Requires an Attorney to Investigate the Case and Present a Defense**

A "lawyer who fails adequately to investigate, and to introduce into evidence, [evidence] that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question  to undermine confidence in the verdict, renders deficient performance." *Hart v. Gomez,*   174 F.3d 1070; see also *Lord v. Wood,*  184 F.3d at 1096.

C.   **Trial Counsel's Failure to Present Petitioner's Medical Records  Constituted Ineffective Assistance**

The law required trial counsel obtain and introduce petitioner's

32

medical records.   Petitioner's mental state constituted a critical issue in the case since attempted murder requires a certain mental state, namely a specific intent to kill. *People v. Lee,* 31 Cal.4th at 623; see *People v. Swain,* 12 Cal.4th at 604-605.

Petitioner's entire defense revolved around his state of mind.  And his state of mind, particularly the reason he bought and used a gun, resulted from a recent gunshot wound.  Trial counsel failed to introduce the medical records to corroborate petitioner's version of the events.  The medical records show that petitioner actually had been wounded by a gunshot. Petitioner's medical records also corroborated petitioner's testimony that he had been violently attacked in jail.

Without petitioner's medical records, trial counsel presented only petitioner and the two women as witnesses.  On the other hand, petitioner's medical records constituted concrete proof that he had indeed suffered a gunshot wound, bought a gun to protect himself, and acted out of self defense and/or the defense of others.

Trial counsel's failure to present the medical evidence denied petitioner of his federal constitutional rights to  the effective assistance of trial counsel, due process and a fair trial  under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth Amendment. See also, *Strickland* v. *Washington,*   466 U.S. at  687.

Therefore, relief should be granted.

## VII.   HABEAS RELIEF SHOULD BE GRANTED BECAUSE TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY ADMITTING THE TRANSCRIPT AND NOT THE TAPE OF PETITIONER'S POLICE INTERVIEW INTO EVIDENCE

### A.  Introduction

Trial counsel and the prosecutor stipulated to the accuracy of the transcripts.  (Trial Exh.  F.)  Actually, the transcripts differed drastically from the tapes.   The March 8, 2005 tape is largely unintelligible.  (CT 412-424; Exh. G [tape and transcripts].) The transcripts of the March 9, 2005 interview with petitioner omitted petitioner's extremely distressed emotional state.  (See, CT 416-424; Exh. H [tape and transcripts].)  The March 9, 2005 transcripts failed to show how petitioner cried throughout the interview.  The March 9, 2005 transcripts also omitted information about petitioner's state of mind during the shooting incident.

Trial counsel's stipulation deprived the jury of hearing petitioner's actual statements to the police in violation of petitioner's rights to counsel, due process and a fair trial  under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth Amendment.  (RT 756.)

Relief should be granted.

### B.   Transcripts and/or Tape Records Are Not Admissible under Certain Circumstances.

Transcripts and/or tape records are not admissible if they are so completely intelligible to be relevant without creating an inference of speculation or unfairness. Cf. *People v. Demery,* 104 Cal.App.3d 548, 559 (1980);  *People v. Miley,* 158 Cal.App.3d 25, 36 (1984) [tape recording containing unintelligible parts was not unduly prejudicial as admitted]; *People v. Von Villas,* 11 Cal.App.4th 175, 225 (1992)[tape recording of

34

prison conversation containing numerous gaps and unintelligible portions properly admitted because audible portion was clearly relevant to the case]; *United States v. Robinson,* 707 F.2d 872  (6th Cir. 1982) [case reversed based on innumerable inaccuracies in the transcripts].

### C. Trial Counsel Rendered Ineffective Assistance by Stipulating to the Accuracy of the Transcripts and in Failing to Admit the Tapes Themselves

At trial, "[t]he People and the Defense stipulate[d] that the transcripts of the defendant's interviews are a true and accurate reflection of those taped conversations between the defendant and Corporal Ruiz."  (RT 758.)

The March 8, 2005 transcript failed to accurately depict petitioner's conversations with the police.  A majority of the tape could not be clearly heard. The voices and background noise make inaudible several portions. (CT 412-413; Exh. G.) The March 9, 2005 transcript omits several crucial portions of petitioner's statements to the police.  For example, the transcript omits petitioner's statement that he did not even know the shooting was going to happen, that he was scared for Claudia and that he believed Mejia had something in his pocket. He also says that he went swimming at his grandmother's house (CT, 429, 430, 433, 437; Exh.  H at 3, 6, 10. )  The transcript fails to show how petitioner cried throughout his interview.  (CT 427-428; Exh.  H at 3, 6, 10. )

The transcript introduced into evidence lacked sufficient accuracy in material respects to justify its use by the jury. The inaccuracies severely detracted from the overall accuracy of the transcript and called into question the reliability of the entire transcript.  "[T]ranscripts of admissible tape recordings are only prejudicial if it is shown they are so inaccurate that the jury might be misled into convicting an innocent man." *People v.*

*Brown,* 225 Cal.App.3d 585, 599 (1990)  citing *People v. Fujita,* 43 Cal.App.3d 454, 472-473 (1974).

The transcript prepared by the prosecution and submitted into evidence by joint prosecution and defense stipulation presented this risk. The jury never heard what petitioner actually said and how he said it. Therefore, trial counsel's stipulation to the accuracy of the transcripts and failure to submit the tapes themselves into evidence, deprived petitioner of his state and federal constitutional rights to the effective assistance of trial counsel, due process and a fair trial  under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth Amendment. See also, *Strickland* v. *Washington,*   466 U.S. at  687.

Therefore, relief should be granted.

## VIII.  HABEAS RELIEF SHOULD BE GRANTED BECAUSE TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT TO THE ERRONEOUS ADMISSION OF IRRELEVANT AND PREJUDICIAL EVIDENCE CONSISTING OF A SKI MASK, GLOVES AND RAP LYRICS

### A.    Introduction

The prosecution presented evidence that Ruiz found rap lyrics, black knit gloves and a black hat in petitioner's car.  (RT 190, 205-208, 231; Trial Exhs. 12, 13.)  During cross-examination, petitioner admitted that he had the items in his car.  (RT 493-502.) The evidence of the lyrics, the black knit gloves and the black hat had nothing to do with gang involvement and the shooting of Mejia.  The evidence deprived petitioner of  the right to counsel, due process and a fair trial  under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth Amendment. See also, *Strickland v. Washington,*  466 U.S. at  687.

1    Therefore, relief should be granted.

2    **B.    The Evidence Code Permits the Introduction of Evidence If**
3        **the Probative Value Outweighs the Prejudicial Effect**

4    Relevant evidence is admissible.  Cal. Evid. Code §§ 350, 351. Cal.

5    Evid. Code § 210 defines "relevant" in pertinent part as "evidence, . . .

6    having any tendency in reason to prove or disprove any disputed fact that

7    is of consequence to the determination. See also *People* v. *Torres,* 61

8    Cal.2d 264 (1964);  *People* v. *Simms,* 10 Cal.App.3d 299 (1970).  Cal.

9    Evid. Code § 352 permits a court to exclude irrelevant and/or prejudicial

10   evidence. See also*, Guam v. Shymanovitz,* 157 F.3d 1154 (9th Cir. 1998)

11   [Ninth Circuit reversed case holding, "*There is simply no doubt that a wide*

12   *gulf separates the act of possessing written descriptions or stories about*

13   *criminal conduct from the act of committing the offenses described.*" *Id.* at

14   1159; italics added.

15   **C.    Trial Counsel Rendered Ineffective Assistance by Failing to**
16       **Object to the Erroneous Admission of Irrelevant and**
        **Prejudicial Evidence about a Ski Mask and Gloves**
17   The prosecution presented irrelevant and highly prejudicial evidence

18   that Ruiz found black knit gloves and a black hat in petitioner's car.  (RT

19   190, 205-208, 231; Trial Exh. 13.)  The evidence of the black knit gloves

20   and the black hat had no evidentiary value.  The prosecution failed to show

21   that petitioner ever wore the items or intended to wear the items.  Yet, trial

22   counsel failed to object to the admission of the evidence.  (RT 701-702.)

23   See, *Strickland* v. *Washington,*   466 U.S. at 687.

24   The prosecutor argued the ski cap and the gloves.  First, she read

25   petitioner's lyrics to the jury as follows: "'There's a gun on the left and a

26   Homie on the right. I'll put my ski mask on my face to hide my face cause

27   I'm not gonna catch another case." (RT 759.)  She argued, "The ski cap,

28

the gloves.  Isn't it interesting he has a ski cap or ski mask.  And one of the things he talks about is shooting people with a ski mask on so he doesn't get caught, one of the things he writes about." (RT 786.)

The items unfairly permitted the jury to speculate or conjecture about petitioner's reason to possess the items.   See, *Guam v. Shymanovitz,* 157 F.3d at 1154.

The Constitution guaranteed petitioner due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth Amendment. The lyrics, ski cap and the gloves implied that petitioner intended to use the items for criminal purposes.  Not only did the prosecutor use the items imply that petitioner intended to shoot someone, the ski mask and gloves implied that petitioner intended to rob someone. None of the witnesses testified that petitioner wore the ski cap or the gloves.

Furthermore, the ski cap, the gloves and the rap lyrics constituted inadmissible character evidence under Cal. Evid. Code § 1101 (a) [Character evidence inadmissible to prove conduct on a specified occasion.].)

The ski cap and the gloves and the rap lyrics impermissibly suggested to the jury that, because petitioner claimed in some lyrics that he would wear a ski mask and would use a gun, he must have used a gun on this occasion. See, *People v. Gibson,* 56 Cal. App. 3d 119, 127 (1976) [Evidence of other acts  may not be admitted to show defendant's criminal propensities or bad character to create an inference that defendant committed the charged offense.].

The admission of the ski mask, the gloves and the lyrics into evidence deprived petitioner of the effective assistance of trial counsel, due

process and a fair trial  under the Fifth, Sixth, and Fourteenth

Amendments, and a reliable judgment under the Eighth Amendment. See

also, *Strickland* v. *Washington,*   466 U.S. at 687.

Therefore, relief should be granted.

**IX.    HABEAS RELIEF SHOULD BE GRANTED BECAUSE THE TRIAL COURT DEPRIVED  PETITIONER OF THE RIGHT TO PRESENT A DEFENSE BY UNFAIRLY RESTRICTING PETITIONER'S AND HIS GRANDMOTHER'S TESTIMONY AT TRIAL**

**A.    Introduction**

Trial counsel presented petitioner's grandmother as a witness.

During direct examination, the trial court sustained the prosecutor's

constant objections to trial counsel's questions. During petitioner's

testimony, the trial court sustained the prosecutor's objection to a critical

question.

The inability to fully and fairly present his case deprived petitioner of

his federal constitutional rights to testify, to present a defense, due process

and a fair trial  under the Fifth, Sixth, and Fourteenth Amendments, and a

reliable judgment under the Eighth Amendment. See also, *Strickland* v.

*Washington,*   466 U.S. at 687.

Therefore, relief should be granted.

**B.    The Constitution Guarantees a Criminal Defendant the Right to Prepare and Present a Defense.**

"Whether rooted directly in the Due Process Clause of the

Fourteenth Amendment [citation], or in the Compulsory Process or

Confrontation clauses of the Sixth Amendment [citations], the Constitution

guarantees criminal defendants 'a meaningful opportunity to present a

complete defense.' " *Crane v. Kentucky,* 476 U.S. 683, 690 (1986).

**C.    Relief Should Be Granted Because the Trial Court Denied Petitioner His Constitutional Right to Present a Defense by Restricting His and His Grandmother's Testimony**

**Petitioner's Grandmother**

Petitioner's grandmother testified for petitioner. Her testimony would have corroborated petitioner's desire to remove his tattoos.  She would have testified about petitioner's state of mind and the rap lyrics found in petitioner's car.

The trial court restricted petitioner's grandmother's testimony:

Q BY MR. DE LA PENA: When you picked up the car, did you pick it up and take it to your home?

A [BY PETITIONER'S GRANDMOTHER]: Yes, I did.

Q: Did you happen to notice if there were any items in the car, paperwork or anything like that?

A: Um, yes.  Um, he had um, received from, um, the – probation department a letter, um, um, from, um his probation officer.

THE COURT: Just tell us what items you found in the car.

THE WITNESS: That's what I'm trying to do.

THE COURT: A letter from probation.

THE WITNESS: It was an item from the probation officer that, um, um, tattoos be gone that Timothy had requested. And, um –

MS. RINAURO; Your honor, motion to strike the last part, calls for speculation, lack of foundation.

THE WITNESS:  – I was –

1        THE COURT: Hold on.

2        The portion "that Timothy had requested" is stricken.  The
jury is to disregard that.  Everything else will remain.  (RT 643-

3  644.)

4

5        The trial court erred because petitioner's grandmother had a basis for

6  her statement that petitioner had requested tattoo removal information from

7  his parole officer.  His parole officer conducted routine visits to her house.

8  Once, petitioner's grandmother saw and heard petitioner asking for

9  information about tattoo removal.  At a follow-up visit, petitioner's

10  grandmother saw and heard petitioner tell his parole officer that he never

11  received the information.  Petitioner's parole officer said that she forgot and

12  would send the information to him.  On the day of the incident, petitioner

13  picked up the tattoo removal information from his grandmother's house.

14        Petitioner's grandmother tried to testify about petitioner's mother's

15  death as follows:

16        BY MR. DE LA PENA: Your daughter is Mr. Driggars'
mother?

17

18        A: Yes.

19        Q: And when did she pass away?

20

21        MS. RINAURO: Objection; relevance.

22        THE COURT: Overruled.

23        THE WITNESS: She passed away on August the 9th,

24  2001.

25        BY MR. DE LA PENA: And did you notice anything

26  unusual about Mr. Driggars when she passed away?

27        A: Um, Timothy became, um, obviously he was – he was

28        –

1    MS. RINAURO: Objection; relevance.

2    THE COURT: Overruled.

3

4    THE WITNESS: He was very, um – he was very
     distraught and he was very attached to, um –
5

6    MS. RINAURO: Objection; nonresponsive.

7    THE COURT: Sustained.

8

9    BY MR. DE LA PENA:

10    Q: Okay.

11    A: He was very distraught.  (RT 646.)

12

13    Petitioner's grandmother would have testified that petitioner became

14    very distraught over the death of his mother. After her sudden and

15    unexpected death, petitioner became sad, withdrawn and despondent.

16    Petitioner requested grief counseling with the Youth Authority.  His

17    requests went unanswered.

18    At trial, petitioner's grandmother tried to explain why she could not

19    visit him in jail:

20    BY MR. DE LA PENA: Okay.  Now, during his
     incarceration, would you visit him?
21

22    A: Yes.  I visited him regularly.

23

24    Q: Is there a time when you were not able to visit him?

25    MS. RINAURO: Objection.  Irrelevant.

26    THE COURT: Sustained.  (RT 647-648.)

27

28    The trial court erred because petitioner's grandmother needed to

42

explain that while petitioner was incarcerated, she could not visit him for several months. He was transferred to a lock-down mental health unit because he tried to commit suicide after his mother died.

> BY MR. DE LA PENA: Did you feel – did you see or feel that he [petitioner] had any, shall we say, mood swings after his mother's death?

> MS. RINAURO: Objection; irrelevant.

> THE COURT: Sustained.

> BY MR. DE LA PENA: Did you notice anything different about him after his mother died?

> MS. RINAURO: Objection; relevance.

> THE COURT: Same ruling.  Sustained.  (RT 648.)

Petitioner's grandmother would have testified that, after his mother died, petitioner covered himself with Orange County gang-affiliated tattoos to protect himself from other gang affiliated youth.  The tattoos demonstrated that he was strong and, in his grandmother's opinion, helped mask his grief.  (CT 442-444.)

The court sustained the prosecutor's objection when petitioner's grandmother started to testify about why petitioner picked up the stack of lyrics from her house as follows:

> BY MR. DE LA PENA: Okay.  Have you seen those items [the lyrics] before?

> A: I had a stack of – of lyrics that he sent to me, and he, um, picked them up and, um, with the intention of –

> MS. RINAURO; Objection: Nonresponseive.

43

1    THE COURT:   Sustained.  The answer is stricken.  (RT
2    651.)
3    The question was the items that were just shown to you, have you seen those before?

4
5    A: Yes, I have.

6    THE COURT: Next question, please.

7    BY MR. DE LA PENA: Did you read them?
8
9    A: Yes.

10    Q: Okay.  And did he tell you what he intended to do with
11    them?

12    MS. RINAURO: Objection.  Calls for hearsay.

13    BY MR. DE LA PENA: Do you know what he intended to
14    do with them?

15    THE COURT: That's sustained.
16
17    MS. RINAURO: Objection; calls for speculation.

18    THE COURT: Sustained.

19    THE WITNESS: He –
20
21    THE COURT: Sustained.
22    When I rule on an objection, you have to –

23    THE WITNESS: Oh, okay.

24    THE COURT:  – Abide by the ruling.
25    Thank you.
26    Next question, please.  (RT 651-652.)

27    The trial court erred by sustaining the objection because petitioner's
28    grandmother would have testified that petitioner asked her to save the rap

44

lyrics because he intended to professionally record them and pursue a recording contract.  Petitioner's grandmother would have testified that petitioner had a friend with professional recording equipment and that after his release, petitioner recorded a demo tape of rap lyrics that he had written to honor of his mother's death.  (CT 444; Exh. I at 3.)

**Petitioner's Testimony**

The prosecutor also objected to questions that trial counsel asked petitioner.  Trial counsel asked petitioner what he believed Mejia planned to do to him [petitioner].  The trial court sustained the prosecutor's objection.

The trial court restricted petitioner's testimony as follows:

MR. DE LA PENA: Okay.  Did you feel that these young men were up to know good?

MS. RINAURO: Objection.  Vague, calls for speculation.

THE COURT: Sustained.  (RT 492.)

The trial court erroneously and prejudicially restricted petitioner's and petitioner's grandmother's testimony.  The jury had to decide if petitioner acted in perfect self-defense (*People v. Randle,* 35 Cal.4th at 994) or imperfect self-defense. *In re Christian S.,* 7 Cal.4th 768, 771. Furthermore, the jury needed to determine if petitioner acted in the perfect or imperfect defense of others.  Cal. Penal Code §§ 197,  3, 198; *People v. Randle,*  35 Cal.4th at 997.

Petitioner needed to explain what he believed the men were going to do.  When trial counsel asked petitioner whether he felt the men were up to no good.  Trial counsel essentially asked petitioner about his perceptions about the two men.  Petitioner's perceptions constituted the crux of his

45

defense.

Both petitioner's and his grandmother's testimony would have assisted the jury in decided whether petitioner acted reasonably or unreasonably when he shot Mejia.  The evidence showed that petitioner had a very difficult life.  He spent most of his formative years in custody and lost his mother at an early age.  He needed psychological treatment.

Petitioner's grandmother's testimony about petitioner's mother's death would have helped the jury understand petitioner's reaction to what petitioner perceived as threatening behavior by Mejia.  Petitioner was afraid that Mejia would kill petitioner's girlfriend and her sister as well as petitioner himself.  Petitioner's vulnerability to loss would have affected his belief in the need to act in self-defense and the defense of the others that he loved.

Petitioner had the right to present a defense.  The trial court deprived petitioner of that constitutional right by excluding petitioner's grandmother's crucial testimony about petitioner's feelings and motivations.  The trial court also excluded petitioner's grandmother's corroborating testimony about petitioner's efforts to remove his tattoos and write rap lyrics.  Unless petitioner could testify about what he believed the men were going to do, he was deprived of fully and fairly presenting his defense.

Therefore, the trial court denied petitioner his constitutional right to due process and a fair trial  under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth Amendment. See also, *Strickland* v. *Washington,*   466 U.S. at 687. Relief should be granted.

46

**X.    HABEAS RELIEF SHOULD BE GRANTED BECAUSE TRIAL COUNSEL'S FAILURE TO CHALLENGE THE ADMISSION OF THE PREJUDICIAL HEARSAY EVIDENCE PRESENTED VIA THE GANG EXPERT DEPRIVED PETITIONER OF THE EFFECTIVE ASSISTANCE OF COUNSEL**

**A.  Introduction**

The prosecution charged petitioner with participating in street terrorism and alleged that he committed the shooting to benefit a criminal street gang. Cal. Penal Code §§ 186.22  (a), (b). Ruiz, testifying from field interview ("FI") cards and other police documents, including police reports, detailed all the police contacts showing petitioner's Lopers affiliation.  (RT 219-227.) The prosecution never presented any of the witnesses who prepared the police documents. Trial counsel failed to object to the inadmissible gang evidence presented via Ruiz. Trial counsel rendered ineffective assistance.

Therefore,  relief should be granted.

**B.    California Law Prohibits an Expert from Presenting Inadmissible Hearsay as the basis for His/Her Opinion**

In California, expert testimony may be premised on material that is not admitted into evidence if it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions. *Id.*; Cal. Evid. Code § 801 (b); *In re Fields,* 51 Cal.3d 1063, 1070 (1990); *People v. Montiel,* 5 Cal.4th 877, 918 (1993).

But, an expert may not "under the guise of reasons" bring incompetent hearsay evidence before the jury.  *Montiel* at 918-919, citing *People v. Coleman,* 38 Cal.3d 69, 91-93 (1985); see also *People v. Killebrew,* 103 Cal.App.4th 644 (2002) [trial court abused its discretion in allowing extensive, incompetent hearsay to be admitted through the gang

47

expert's testimony under the guise of giving reasons for his opinion that the various participants in the alleged conspiracy were gang members].

### C. Trial Counsel's Failure to Move to Exclude Ruiz' Prejudicial Hearsay Statements Linking Petitioner to the Criminal Street Gangs Deprived Petitioner of the Effective Assistance of Trial Counsel

Ruiz, testifying from FI cards and other police documents, including police reports, detailed all the police contacts showing petitioner's Lopers affiliation. None of the percipient witnesses testified about any of the police contacts. Furthermore, the prosecution never presented any evidence supporting Ruiz' opinion that petitioner associated with known gang members. Trial counsel failed to object to Ruiz' testimony elicited from FI cards and other police documents which included:

1.  An FI card dated March 4, 2000 stated that petitioner' was in Lopers' territory.   (RT 220.)

2.  A February 19, 2002 FI card stated that petitioner had been with Bobby Alcaraz, a documented Lopers gang member.  (RT 221.)

3.  A March 26, 1997 police report stated that petitioner had been found in Lopers territory with  Juan Quezada.  (RT 221-222.)

4.  An August 26, 2004 document contained information written by law enforcement showing that petitioner had a moniker. (RT 222-223.)

5.  A July 28, 2002 police report tied petitioner to the Lopers.  The police report contained information showing that  petitioner claimed he was 5th Street Loper and had gang member relatives.  (RT 224-225.)  He talked about rival gang members and gang fights.  (RT 225.)

6.  A July 4, 2002 police document stated that petitioner said that he had family members in the gang and petitioner's admission of gang affiliation. (RT 226.)

48

7.   An August 30, 2004 police document "tied" petitioner to the Lopers. (RT 226.)  The document stated that  petitioner said he was a Loper gang member with moniker Huero ("Light Skinned Person"). (RT 226-227.)

8.   An August 26, 2004 police document stated that  petitioner was a gang member with a moniker.  (RT 227.)

The prosecutor heightened the effect of the inadmissible hearsay when she argued the inadmissible hearsay to the jury.  See, *People v. Brady,* 190 Cal.App.3d 124, 138 (1987) [Prosecutor's argument compounded the instructional defect];  *People v. Martinez,* 188 Cal.App.3d 19, 26 (1986) [Prosecutor's argument heightened instructional defect]. The prosecutor argued "You know he had several [police] contacts from the date that he joined the gang to the date of the shooting because you heard Corporal Ruiz testify to his FI card, to the police reports, the several contacts he had with law enforcement." (RT 759.)

"'Hearsay evidence,' " defined as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated," is generally inadmissible. Cal. Evid. Code § 1200.

Hearsay is a question of admissibility for it is a matter of the reliability of evidence and the fundamental fairness of the hearing procedures. *Idaho v. Wright,* 497 U.S. 805, 111 L. Ed. 2d 638, 110 S. Ct. 3139 (1990).  "The main reasons for excluding hearsay evidence are: '(a) The statements are not made under oath; (b) the adverse party has no opportunity to cross-examine  the person who made them; and (c) the jury cannot observe his demeanor  while making them.' [Citations.]" *People v. Williams,* 222 Cal. App. 3d 911, 916 (1990).

Ruiz, the prosecution's gang expert, testified that, based on hearsay

49

evidence of petitioner's association with certain people, petitioner belonged to a gang at the time of the shooting. Not only did Ruiz base his opinion on hearsay, the prosecutor elicited the inadmissible hearsay from Ruiz.  None of the witnesses who Ruiz testified about came to testify at trial.  Instead, Ruiz simply read from various unreliable police documents.  None of the people who prepared the documents testified at trial.  Therefore, the information from the documents constituted inadmissible, prejudicial hearsay.  Cal. Evid. Code § 1200.

Trial counsel failed to object to the hearsay testimony.  Defense counsel permitted the prosecution to present inadmissible hearsay to the jury in violation of petitioner's right to confront and cross examine witnesses, due process and a fair trial  under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth Amendment. See also, *Strickland* v. *Washington,*   466 U.S. at 687.

Therefore, relief should be granted.

## XI.    HABEAS RELIEF SHOULD BE GRANTED BECAUSE THE TRIAL COURT DEPRIVED PETITIONER OF DUE PROCESS AND A FAIR JURY TRIAL BY ADMITTING THE GANG EXPERT'S TESTIMONY ON THE ULTIMATE FACTS

### A.    Introduction

The prosecution alleged that petitioner committed the murder "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . .   " Cal. Penal Code § 186.22  (b).  The prosecution expert opined that petitioner committed the shooting to benefit the gang.  (RT 237-241.)

Trial counsel  objected to the gang expert's opinion on whether

1  petitioner specifically intended to commit the offenses to benefit the gang.

2  (RT 241.) Cal. Penal Code § 186.22 (b). The trial court overruled the

3  objection. Therefore, petitioner was denied his state and federal

4  constitutional rights to the effective assistance of trial counsel, due process

5  and a fair trial under the Fifth, Sixth, and Fourteenth Amendments, and a

6  reliable judgment under the Eighth Amendment. See also, *Strickland* v.

7  *Washington,* 466 U.S. at 687.

8  ## B.   California Law Restricts Expert Opinion

9  An expert may offer opinion testimony if the subject is sufficiently

10  beyond common experience that it would assist the trier of fact. Cal. Evid.

11  Code § 801. The opinion must be based on matter perceived by, or

12  personally known, or made known to the witness at or before the hearing

13  that is of the type that reasonably may be relied on in forming an opinion

14  on the subject to which the expert's testimony relates. Cal. Evid. Code §

15  801.

16  On direct examination, an expert may state the reasons for his or her

17  opinion and the matter upon which the opinion is based. Cal. Evid. Code §

18  802. Otherwise admissible expert opinion testimony which embraces the

19  ultimate issue to be decided by the trier of fact is admissible. Cal. Evid.

20  Code § 805.

21  Expert testimony has frequently been used in cases involving gang

22  enhancements. E.g., *People v. Gardeley,* 14 Cal.4th 605, 619-620 (1996)

23  [expert testimony to establish gang met definition of criminal street gang];

24  *People v. Valdez,* 58 Cal.App.4th 494, 506 (1997) [expert testimony

25  regarding culture, habits, and psychology of gangs permissible]; see also

26  cases detailed in *People v. Killebrew,* 103 Cal.App.4th at 656-657.

27  However, all expert testimony relating to gangs is not admissible.

28

51

See, *People v. Killebrew,* 103 Cal.App.4th at 644, 652 [Error to permit an expert to testify that "when one gang member in a car possesses a gun, every other gang member in the car knows of the gun and will constructively possess the gun."].

"[A]n 'expert must not usurp the function of the jury . . . ' " *Summers v. A. L. Gilbert Co.,* 69 Cal.App.4th 1155, 1183 (1999).

### C.   The Trial Court Deprived Petitioner of Due Process and a Fair Trial by Failing to Exclude the Gang Expert's Opinion on Ultimate Facts

The prosecution alleged an enhancement, namely, that petitioner shot Mejia to further the street gang's interests.  The enhancement has its own mens rea element - that the defendant intended to benefit his gang by committing the underlying offense. Cal. Penal Code § 186.22(b)(1).

The prosecutor asked Ruiz as follows:

MS. RINAURO:  Based on investigating facts of this case, talking to the witnesses, hearing the witnesses testify, talking to police officers, reviewing photographs, looking at the tattoos of the defendant, during the background investigation on the prior police reports, the prior documents we've talked about, the prior field interviews; based on the evidence that you talked about you recovered from the car, the gun, the belt, all the writings, do you have an opinion as to whether or not, on March 8th, 2005, the defendant Timothy Driggars, was an active participant of the Lopers criminal street gang?

A: I do.

Q: What is that opinion?

A: He was an active participant of the Lopers criminal street gang.  (RT 237-238.)

Ruiz also testified that a criminal street gang member would have

knowledge of the gang members pattern of criminal activity as follows:

BY MS. RINAURO: Based on our training and experience, do you have an opinion as to whether or not one who is an active participant of a criminal street gang would have knowledge of the gang members pattern of criminal gang activity?

A: Yes.

Q: And what is that; would they?

A: Yes.

Q: How?

A: I think the letters such as this that I found are very telling. You are communicating secondly –

Q: I'll cut you off.
Just generally speaking, hypothetically. I'll ask you not based on this case but hypothetically speaking, does active participants of a criminal street gang, any gang, based on your training and experience, have knowledge of the gang's pattern of criminal activity?

A: Yes.

Q: How do gang members know about each other's criminal activity?

A: Through talking, basic talking, basic communication being the first way of getting information. (RT 238-239.)

Q: I'm going to ask you a hypothetical question. It's a long one.
Hypothetically speaking, assume we have a person that we'll call an active participant, and that person is an active participant, is actually in a gang territory that we'll call Lopers. The active participant is in the Lopers criminal street gang, an active participant in that gang. The active participant has the following tattoos on his body: left side of his head, "Lopers

Calle 5;" right side of his head, "State raised;" left elbow, "LPSOC;" abdomen, "Lopers;" back of neck, "Lopers 13."

Active participant observes two Hispanic males walking down the street toward the store. Active participant is in a vehicle with two female teenagers. Active participant gives a mad dog stare or a mean stare to the females – I'm sorry to the male. One of these males that is walking down the street, we'll call victim. Neither of the males has a weapon on them. Neither of the males has any gang background or gang affiliation.

Active participant backs his car into a parking stall in front of the store. The males walk to the front of the store and active participant asks them or victim "Who do you represent?" Victim responded in a manner saying he didn't represent anyone. Active participant made a derogatory comment about the victim's face and shot at victim one time hitting him in the stomach.

Active participant was arrested less than a half hour of the shooting in an area not far away. Active participant's car was searched. In the car active participant was driving a .25 caliber automatic pistol was recovered. In the car was gang indicia tying active participant to Lopers criminal street gang. Examples of some of the gang indicia was a belt with the letter "C" on it; many letters or writings with a moniker "Huero" which happens to be active participant's moniker; a calendar with writing on it; and letters to and from "Huero" talking about gang activity.

Based on the fact of the hypothetical that I just gave you, do you have an opinion as to whether or not the particular crimes committed in the hypothetical were committed for the benefit of, at the direction of, or in association with the Lopers criminal street gang?

A: Yes. (RT 228-241.)

MR. DE LA PENA: Your honor, I have to object.

THE COURT; State your grounds.

MR. DE LA PENA: My grounds are it's calling for a conclusion, for a legal conclusion. That's up to the jury. That's what the

1   jury is for, based on the facts as presented.

2   THE COURT: Okay.  Overruled.  (RT 241.)

3

4

5   Ruiz also testified that ". . . If you sever your ties or you are not part

6   of the gang, you get rid of all this stuff.  And secondly, is that the letters

7   and how they're written, the use of various street vocabulary, the slang

8   words regarding the firearms, the monikers, the reference to Lopers gang,

9   all of it is consistent to, more or less, being for or about current events or

10  just talking about that lifestyle." (RT 232.)

11  Ruiz' testimony did not assist the jury in evaluating the evidence and

12  determining if the actions of the perpetrators were done for the benefit of

13  the  gang. The jury should have determined the gang issue without the

14  gang expert's testimony.  Instead, Ruiz testimony usurped the function of

15  the jury in violation of due process and petitioner's right to a jury trial.

16  Trial counsel objected to the testimony, but the trial court overruled

17  the objection and permitted the jury to hear the evidence.  The trial court's

18  failure to exclude the testimony deprived petitioner of due process and a

19  fair trial  under the Fifth, Sixth, and Fourteenth Amendments, and a reliable

20  judgment under the Eighth Amendment.

21  Therefore, relief should be granted.

22

23

24

25

26

27

28

## XII.   HABEAS RELIEF SHOULD BE GRANTED BECAUSE THE PROSECUTOR COMMITTED PREJUDICIAL MISCONDUCT BY VOUCHING FOR THE WITNESSES' CREDIBILITY; TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT

### A.   Introduction

During argument, the prosecutor improperly vouched for the prosecution's witnesses' credibility. (RT 718, 719, 728, 751, 776, 779, 782.)  The vouching constituted prejudicial misconduct and denied petitioner due process and a fair trial.  Trial counsel failed to object. *Strickland v. Washington,*   466 U.S. at 687. Therefore, relief should be granted.

### B.   A Prosecuting Attorney Commits Misconduct by to Expressing His or Her Personal Belief as to the Reliability of a Witness

A prosecutor's closing argument is an especially critical period of trial. *People v. Alverson,* 60 Cal.2d 803, 805 (1964).  Since it comes from an official representative of the People, it carries great weight and must therefore be reasonably objective. *People v. Talle,* 111 Cal.App.2d 650, 677 (1952). A prosecutor may not appeal to the passion or prejudice of the jury is improper.  *People v. Haskett,* 30 Cal. 3d 841, 863 (1982); *People v. Talle,*  111 Cal.App.2d at 676.

A prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of government witnesses. *United States v.*

56

*Molina,* 934 F.2d 1440, 1444  (9th Cir. 1991); *United States v. Ortiz,* 362 F.3d 1274, 1279 (9th Cir. 2004) ["Whether the witnesses have testified truthfully . . . is entirely for the jury  to determine . . . ]; see also *Berger v. United States,* 295 U.S. 78, 88, 79 L.Ed. 1314, 55 S. Ct. 629 (1935).

A prosecutor need not actually to use the words "I believe," or any similar phrase, for a statement to constitute improper comment on the credibility of witnesses. See, e.g., *United States v. Bess,* 593 F.2d 749, 757 n. 10 (6th Cir.1979) [attorney "may not state, 'The prosecution's witnesses are telling the truth,' or 'I believe the prosecution's witnesses are telling the truth' "]. Even the use of the words "I want to suggest" could constitute improper comment on witness credibility.  *United States v. Krebs* 788 F.2d 1166, 1176-77 (6th Cir.1986); *see also United States v. Carroll* 26 F.3d 1380, 1387, 1389 (6th Cir.1994).

Vouching is especially problematic in cases where the witnesses' credibility is crucial. See *United States v. Necoechea,* 986 F.2d 1273, 1276 (9th Cir. 1993).

**C.    The Prosecutor Committed Prejudicial Misconduct by Vouching for the Witness' Credibility**

During closing, the prosecutor committing several instances of misconduct by repeatedly arguing to the jury that her witnesses told the truth.  The prosecutor argued as follows:

1   　　　MS. RINAURO:  "And when he called – remember the
2   testimony, *Oscar was honest with you.  How do you know?*
3   *There's two ways you know Oscar was honest with you and*
    *told the truth.*"  (RT 762; italics added.)
4
5   　　　　　　　　　　　* * *

6   　　　"There's another reason, why you know *Oscar Ramirez*
7   *was honest.*  What did he say? He said I saw the defendant
    talking to my brother and the defendant walked forward but I
8   have a hearing problem.  I couldn't hear the exact words that
9   were said. ¶ If he was lying to you, he would make up the
    words the defendant said, but *he was honest.* . . . "  (RT 763;
10  italics added.)

11  　　　　　　　　　　　* * *
12
13  　　　"There are defenses the law allows for attempted murder,
    and there's two different kinds of defenses.  *I submit to you,*
14  neither one applies in this case, and the defendant is not
15  entitled to either one. . . ."  (RT 771; italics added.)

16  　　　　　　　　　　　* * *
17
18  　　　She closed her argument with the words, "*He's*
19  *[Petitioner's] guilty.*"  (RT 795; italics added;  see also 826
    ["He's guilty"].)
20
21  　　　　　　　　　　　* * *

22  　　　She argued, "There is absolutely no evidence that Mynor
23  and Oscar were out to confront the defendant.  And, *I disagree,*
    but you are the judges of the facts.  Mynor didn't say he wanted
24  to fight . . . "  (RT 820; italics added.)
25
26  　　　　　　　　　　　* * *

27  　　　She further argued, "*I disagree with the evidence,* but you
28  are the judge's [sic] of Mr. De la Pena."  (RT 823; italics

　　　　　　　　　　　58

1    added.)

2

3                                    * * *

4

5          "Oscar Ramirez was an innocent bystander, and he told
     the truth on that 911 tape, and *he told the truth in court*, and
6    there's nothing to contradict that.  And so was Mynor Mejia."
     (RT 823; italics added.)
7

8                                    * * *

9          ". . . He didn't have a right to shoot Mynor Mejia that day.
10   He's guilty." (RT 826; italics added.)

11         The prosecutor committed misconduct by expressing her personal

12   belief as to the reliability of the prosecution's witnesses. The prosecutor

13   unfairly deprived petitioner of his constitutional rights to due process and a

14

15   fair trial by expressing her opinions about petitioner's guilt or her belief in

16   the credibility of government witnesses." *United States v. Molina,* 934 F.2d

17
     1440, 1444 (9th Cir. 1991).
18

19         In a case where credibility counted, and the jury had to decide

20   whether to believe petitioner or the brothers, the prosecutor's prejudicial,

21
     erroneous and unfair comments violated petitioner's rights to due process
22

23   and a fair trial  under the Fifth, Sixth, and Fourteenth Amendments, and a

24   reliable judgment under the Eighth Amendment.  Trial counsel's failure to

25   object constituted ineffective assistance of counsel.  See, *Strickland* v.

26
     *Washington,*   466 U.S. at 687.
27

28         Therefore, relief should be granted.

                                    59

1
2

### XIII.   HABEAS RELIEF SHOULD BE GRANTED BASED ON THE CUMULATIVE EFFECT OF THE ERRORS

3
4
5
6

Trial counsel prejudicially failed to thoroughly investigate and present a defense.  The prosecution committed prejudicial misconduct. The trial court erred.

7
8
9
10
11
12
13
14
15

The cumulative effect of the errors deprived petitioner of his constitutional rights to due process and a fair trial  under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth Amendment. See, *In re Sixto,* 48 Cal.3d 1247, 1264-1266 (1989); *In re Cordero,* 46 Cal.3d 161,  180 (1988); *People v.  Ledesma,* 43 Cal.3d 171, 216 (1987) [cumulative error held to be prejudicial in habeas corpus proceedings consolidated with the defendant's appeal].

16
17
18
19
20
21
22
23
24
25
26
27
28

1

**CONCLUSION**

2

3
Therefore, relief should be granted.

4
DATED: November 24, 2009

5
Respectfully submitted,

6
FAY ARFA, A LAW CORPORATION

7
/s/ Fay Arfa

8

9
Fay Arfa, Attorney for Petitioner

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

61

# EXHIBIT A



| DATE - HOUR | |
|---|---|



Western Medical Center
Santa Ana, California
SOCIAL SERVICES
PROGRESS NOTES

# HI-CALIBER INVESTIGATIONS
## PRELIMINARY REPORT

| DATE: | 10-13-05 | ATTORNEY: | M.J. De La Pena | | |
|---|---|---|---|---|---|
| CLIENT: | Timothy Driggers | | | DOB: | Unk |
| ADDRESS: | Unknown | | | | |
| PHONE: | | CELL: | | OTHER: | |
| CASE# | Unknown | MISC INFO | | | |

## ASSIGNMENT

On today's date I went to the residence located at 201 S. Oak Street, Santa Ana. I initiated surveillance on the location.

## SCENE INVESTIGATION

However investigation revealed that the entrance gate to apartment #7, has to be accessed thru the gate for apartment #8. They share the same porch area.

No activity was observed coming in or out of apartment #7. I then spoke to the owner of this property. Mr Javier Garcia (717 396-9271) advised me that his tenants from apartment #7, moved last Thursday. He advised he heard they moved to another location in Santa Ana. However he had no contact information for me.

I asked him if he could tell me anything about the conduct, character or reputation of Mynor Mejia. He advised he believed he smoked marijuana. He advised I might be able to find evidence of smoking marijuana on the front porch. I was not able to locate any. Mr Garcia had no further information for me.

## DISCOVERY / SUBPOENAS REQUESTED

None.

3.

10

# EXHIBIT B

# Tetrahidrocannabinol

**Of Wikipedia, the free encyclopedia**

(Redirigido from THC)

**Tetrahydrocannabinol**, also known like **THC**?9-THC?9-tetrahydrocannabinol(delta-9-tetrahydrocannabinol)?1-tetrahydrocannabinol (if we used the classic nomenclature) or **dronabinol** (it forms pharmaceutics that consists of capsules with THC in oil of sésamo), is the main psychoactive substance found in the plants of the sativa species Cannabis L.. In pure state, it has the aspect of crystals to low temperatures, and one becomes viscous and sticky when warming up it. The THC is little soluble in the water, but it dissolves easily in most of organic dissolvents how the ethanol or the hexano.

Their farmacológicos effects are the result of their entailment with the specific receivers of cannabinol located in the brain and all the body. Since the body does not produce naturally cannabinoides, the scientific research began to find out which is the natural substance that connects with these receivers, which took to the discovery of anandamida and the other substances implied in this process.

Probably it is his affinity with the lipofílicas substances what causes that the THC adheres to the membrane of the cells (mainly neuronal).

## Table of contents

- 1 synthetic THC
- 2 molecular Composition of the THC
- 3 Ve'ase also
- 4 external Enlaces

## synthetic THC

In junes of the 2005, the Canadian authorities approved the commercialization of *Sativex*, a buccal aerosol (colutorio), for the symptomatic treatment of the pain in the multiple sclerosis. The same one contains tetrahidrocannabinol associate with cannabidiol. Sent in Canada by *GW Pharmaceuticals*, one is the first drug in the world with cannabis. However, marijuana consumers who have proven the medicine, say that he does not approach effects such that the smoked marijuana, reason why the medicine cannot be used like average drugging itself.

## molecular Composition of the THC

?9-THC, $_{21}CsH_{30}Or_2$. He is easily soluble in ethanol ($CH_3-CH_2--OH$) and in hexano ($_6CsH_{14}$). It is possible to along with obtain oil of THC of the plant or any other derived substance warming up it ethanol so that they dissolve, and once mixed, to wait for to that the ethanol evaporates, being therefore an oily remainder of great wealth in THC..

## Ve'ase



- Cannabis

## external Enlaces

- Escohotado: Marijuana
- Medicinal.com.ar cannabis Information on the uses of the marijuana
- Medicinal marijuana Information on medicinal uses.
- ARSEC Holy Association Ramon of Studies On the Cannabis.

 The content of this page is an outline on chemistry and pharmacology. Extending you will help it to improve Wikipedia.
You can ayudarte with wikipedias in other languages.

Obtained of "http://es.wikipedia.org/wiki/Tetrahidrocannabinol"

Categories: Chemical Wikipedia:Esbozo | Wikipedia:Esbozo pharmacology | Analgesic | Drugs

- This page was modified for the last time the 00:06, 1 feb 2007.
- Content available under the terms of the License of free documentation of GNU (it see **Right of author**).
  Wikipedia® is a registered tradename of the organization without spirit of profit Wikimedia Foundation, Inc..





 | Home | Specialties | Resource Centers | Learning Centers | CME | Contributor Recruitment

February 13, 2007

○ Articles ○ Images ○ CME   ▶Advanced Search           ▶Consumer Health   Link to this site

You are in: eMedicine Specialties > Medicine, Ob/Gyn, Psychiatry, and Surgery > Psychiatry

# Cannabis Compound Abuse

| Rate this Article |
| Email to a Colleague |
| Get CME/CE for article |

Last Updated: October 26, 2004

Synonyms and related keywords: *Cannabis sativa, C sativa*, marijuana, tetrahydrocannabinol, THC, hashish, ganja, pot, weed, reefer, grass, joints, roaches, dope, spliff

---

**AUTHOR INFORMATION**                                   Section 1 of 11   Next▷
Author Information Introduction Clinical Differentials Workup Treatment Medication Follow-up Miscellaneous Pictures Bibliography

---

Author: Robert C Daly, MB, ChB, MPH, BCh, Senior Fellow, Department of Behavioral Endocrinology, National Institute of Mental Health, National Institutes of Health

Coauthor(s): Can M Savasman, MD, Research Associate at the National Institutes of Health, Staff Physician

Editor(s): Barry I Liskow, MD, Vice Chairman, Director Psychiatry Residency Program, Professor, Department of Psychiatry, University of Kansas Medical School; Francisco Talavera, PharmD, PhD, Senior Pharmacy Editor, eMedicine; David Bienenfeld, MD, Vice-Chair, Program Director, Professor, Department of Psychiatry, Wright State University School of Medicine; Harold H Harsch, MD, Program Director of Geropsychiatry, Department of Geriatrics/Gerontology, Associate Professor, Department of Psychiatry, Assistant Professor, Department of Medicine, Froedtert Hospital, Medical College of Wisconsin; and Stephen Soreff, MD, President of Education Initiatives, Nottingham, NH; Faculty, Metropolitan College of Boston University, Boston, MA

Disclosure

---

**INTRODUCTION**                                         Section 2 of 11  ◁Back  Top  Next▷
Author Information Introduction Clinical Differentials Workup Treatment Medication Follow-up Miscellaneous Pictures Bibliography

---

**Background:** The earliest references to marijuana include use by Chinese emperors in 1000 BC. In classical literature, Homer's Iliad records the gift of marijuana from Helen to Telemachus.

Marijuana was introduced to the Western Hemisphere in the early 1500s. African slaves brought marijuana plants with them to the Portuguese colony of Brazil, while the Spaniards began growing it in Chile.

Cannabis was introduced to the Virginia colony of Jamestown in 1611 and to the Massachusetts Bay Colony in 1629. Although primarily used as a source of fiber, cannabis occasionally was smoked. Cannabis began to be used medicinally and was grown by many American planters. By 1850, it was listed in the *US Pharmacopoeia*.

In the United States, recreational abuse of marijuana became more common in the early 20th century. Marijuana was enjoyed with bathtub gin in the Prohibition Era (1920s). In the 1960s, marijuana use became associated with the widespread cultural changes. As a result of the Comprehensive Drug Abuse Prevention and Control Act of 1970, the penalties for marijuana use became substantially less than the penalties for other drugs such as cocaine or heroin. The medicinal use of cannabis currently is the subject of intense legal and medical debate in the United States.

**Pathophysiology:** Cannabis contains several pharmacologically active substances, of which, the most powerful psychoactive member is delta-I-tetrahydrocannabinol (THC). Pyrolysis of marijuana releases more than 100 substances that are subsequently inhaled with the smoke. 1-*trans*-delta-9-THC is thought to be the ingredient most responsible for the mental effects of marijuana.

The route of ingestion of marijuana determines the speed of onset; smoking is the most rapid route. After intake, THC undergoes metabolism to an inactive metabolite (8-11-DIOH-THC) and also to a highly active metabolite (11-OH-delta-9-THC). The half-life of THC is approximately 4 hours. The long life of the active metabolite is explained by the incorporation of the compound in lipid storage depots and similar storage sites in muscle tissue. Thirty to 60% of THC, in all forms, is excreted in feces; the remaining amount is excreted in urine.

Little is known about how marijuana exerts its psychological effects at the CNS cellular level. Most of the hypothesized activities of marijuana are based upon associative evidence. Because marijuana has sedative effects, some studies have hypothesized activation of benzodiazepine (BZ) receptors in the limbic system and cerebellum. Other studies have viewed the sedating properties as potential evidence of GABA receptor activity.

---

**Quick Find**
Author Information
Introduction
Clinical
Differentials
Workup
Treatment
Medication
Follow-up
Miscellaneous
Pictures
Bibliography

Click for related images.

**Related Articles**
Alcoholism
Anxiety Disorders
Bipolar Affective Disorder
Depression
Dysthymic Disorder
Hallucinogens
Inhalant-Related Psychiatric Disorders
Injecting Drug Use
Nicotine Addiction
Opioid Abuse
Panic Disorder
Schizophrenia
Toxicity, Cocaine
Toxicity, Phencyclidine

**Continuing Education**
CME available for this topic. Click here to take this CME.

**Patient Education**
Substance Abuse Center
Drug Dependence & Abuse Overview
Drug Dependence & Abuse Causes
Drug Dependence & Abuse Symptoms

THC binding sites are known to be distributed widely throughout the brain. The density of these sites is highest in the basal ganglia and cerebellum. They are moderately dense in the hippocampus and cortex. These sites of action may partially account for the psychotoxic effects of the drug.



Drug Dependence & Abuse Treatment

Substance Abuse Overview

**Frequency:**

- **In the US:** Marijuana remains the most commonly used illicit drug in the United States. According to data from the 1998 National Household Survey on Drug Abuse (NHSDA), more than 72 million Americans (33%) aged 12 years and older have tried marijuana at least once in their lifetimes.

- Overall, rates of marijuana use appear to be increasing. Recent figures from the National Institute on Drug Abuse (NIDA, 1999) show that almost 50% of 12th-grade students have used marijuana.

- **Internationally:** Rates of abuse vary widely. The hypothesis that cannabis is the most widely used illicit drug in most Western countries is generally accepted.

**Mortality/Morbidity:** No clear evidence of deaths being caused by uncomplicated cannabis overdose exists; however, mortality may be associated with marijuana-related accidents, cancers, and comorbid substance abuse. Likewise, morbidity figures are complicated by comorbid substance abuse.

Animal studies suggest marijuana may cause physical dependence, and some people report withdrawal symptoms (predominantly cravings of a psychological nature).

**Race:** Marijuana is abused among all racial groups, with no propensity for any one race.

**Sex:** Males consistently outnumber females in surveys of marijuana users.

**Age:** Adolescents and young adults are the most common group to abuse this substance; however, abuse may be observed relatively commonly in most age groups.

---

**CLINICAL**                                           Section 3 of 11   [Back   Top   Next]

Author Information  Introduction  Clinical  Differentials  Workup  Treatment  Medication  Follow-up  Miscellaneous  Pictures  Bibliography

**History:**

- People who use marijuana may present either with acute effects of intoxication or with symptoms resulting from chronic use.

  - Onset of symptoms of marijuana intoxication occurs within a few minutes of smoking or within half an hour of oral ingestion. The duration of action usually is 6-12 hours; symptoms are most marked in the first 1-2 hours.

  - The dose of marijuana ingested, the mental state of the subject, and the setting in which cannabis is taken all contribute to the influence of the drug. Chronic users may also be noted to have changes in appetite, diminished drive, and lack of ambition. This "amotivational syndrome" is also characterized by lack of energy and decreased social and occupational drive.

- The following symptoms may be prominent in acute intoxication:

  - Euphoria

  - Relaxation

  - Subjective feelings of well-being or grandiosity

  - Perceptual changes (including visual distortions)

  - Drowsiness and sluggishness

  - Diminished coordination

  - Paradoxical hyperalertness

  - A subjective sense of slowing of the passage of time

  - Increased appetite (the "munchies")

- Although commonly misperceived as universally resulting in a relaxed and euphoric state, cannabis intoxication can produce a dysphoric reaction. Carefully examine patients for evidence of suicidality and homicidality, document presence or absence thereof, and manage as indicated.

4

- o Feelings of panic

- o Disorientation and memory impairment (rare; usually occurs only after ingestion of high-potency cannabinoid preparations)

- o Paranoia

- o Mood lability

- o Altered perceptions (following heavy marijuana use) manifesting as illusions or frank hallucinations, most often visual in type

- o Depersonalization

- o Psychotic episodes

- o Dysphoria

- o Recurrence of psychosis in patients with schizophrenia



**Physical:** Physical signs and symptoms reflect the effects of marijuana on multiple organ systems and can be classified according to the system involved.

- Effects on central and peripheral nervous systems: Cannabis-induced cerebral atrophy or neuropsychological impairment remains a controversial diagnosis. Chronic effects of long-term marijuana use may be related to marijuana's significant fat solubility resulting in high blood levels of the drug after extended use. Marijuana-induced seizures have been described. Studies using simulated driving and flying situations have shown that the use of cannabis has a profound effect on estimations of time and distance and causes impairment of attention and short-term memory. These effects are still discernible 24-48 hours after use of the drug.

- Effects on respiratory system: Cannabis smoke contains carcinogens similar to those found in tobacco smoke, and chronic heavy marijuana use may predispose people to chronic obstructive lung disease. Some studies indicate that pulmonary neoplasms are more common among habitual marijuana users; however, confounding by cigarette smoking limits the interpretability of some of these reports.

- Effects on cardiovascular system: Acute intoxication may induce tachycardia and orthostatic hypotension.

- Effects on reproductive system: Marijuana has been linked to infertility. In vitro studies have reported abnormal cell division and abnormal spermatogenesis resulting in decreased sperm counts; however, the effects of marijuana on human fertility remain unclear. In females, marijuana use may increase the number of anovulatory cycles. In males, marijuana use may cause a decrease in follicle-stimulating hormone, resulting in a decrease in testosterone production and, possibly, testicular atrophy.

- Effects on gastrointestinal tract: Marijuana has known antinausea properties and the use of marijuana has been permitted for the treatment of nausea in some US states for this reason.

- Ocular effects: Injected conjunctivae may occur.

**Causes:**

- Risk factors for use

- o Young age

- o Availability (may be affected by cultural and geographic factors, eg, urban environments)

- o Comorbid alcohol abuse and/or dependence

- o Comorbid drug abuse

| DIFFERENTIALS | Section 4 of 11  [Back  Top  Next] |
|---|---|

Author Information Introduction Clinical Differentials Workup Treatment Medication Follow-up Miscellaneous Pictures Bibliography

Alcoholism
Anxiety Disorders
Bipolar Affective Disorder
Depression
Dysthymic Disorder
Hallucinogens
Inhalant-Related Psychiatric Disorders
Injecting Drug Use
Nicotine Addiction

Opioid Abuse
Panic Disorder
Schizophrenia
Toxicity, Cocaine
Toxicity, Phencyclidine

| WORKUP | Section 5 of 11  [Back  Top  Next] |
|---|---|

Author Information Introduction Clinical Differentials Workup Treatment Medication Follow-up Miscellaneous Pictures Bibliography

**Lab Studies:**

- Cannabinoids can be detected in the urine for as many as 21 days after use in persons chronically using marijuana because these lipid soluble metabolites are slowly released from fat cells into the blood; however, 1-5 days is the normal urine-positive period.

- The primary method for urinalysis detection is enzyme immunoassay or radioimmunoassay. This method is inexpensive, quick, and accurate.

- Urine samples are difficult to obtain from people who are addicted, and providing a urine sample is easily evaded. Urine toxicology testing should be performed under supervised conditions to ensure reliability of results.

- Gas chromatography (GC) in combination with mass spectrometry (MS) and/or thin-layer chromatography (TLC) is used to confirm positive results, especially in legal proceedings.

- With all types of tests mentioned, including TLC, false-negative results tend to be more common than false-positive results.

- Blood samples may be used to measure quantitative levels of cannabinoids.

**Imaging Studies:**

- Earlier reports of ventricular dilatation on CT scan investigation have not been confirmed. No confirmatory imaging study exists for marijuana use.

- Neuroimaging studies, such as CT scanning, MRI, and positron emission tomography (PET) scans, are extensively used to study the neurobiological effects of cannabis abuse but are not clinically useful in the definitive determination of recent abuse.

| TREATMENT | Section 6 of 11  [Back  Top  Next] |
|---|---|

Author Information Introduction Clinical Differentials Workup Treatment Medication Follow-up Miscellaneous Pictures Bibliography

**Medical Care:**

- Acute intoxication usually resolves unremarkably within 4-6 hours and is best managed by the following measures:

   o Frequent reassurance and maintenance of a nonthreatening environment

   o Minimal stimuli

   o Use of a specifically assigned nurse to calm the patient

   o Judicious use of BZs when significant anxiety is present

**Consultations:**

- People who use marijuana and are suffering from biological, psychological, or social impairment from marijuana use should be evaluated and, if necessary, treated by a psychiatrist.

   o The treatment of marijuana abuse follows the general principals of substance abuse, with particular attention paid to psychological and social aspects.

   o Marijuana may be one of many drugs abused, and total abstinence from all psychoactive substances (with the exception of caffeine) is the treatment goal.

   o Interventions may include psychiatric evaluation, occupational and family assessment, and implementation of a comprehensive treatment plan.

      ▪ Psychological issues (eg, denial, minimization, rationalization) must be confronted.

      ▪ Often, cessation of drug use and consequent cognitive improvement result in self-motivation and changes in the occupational and social well-being of the patient.

- Lifestyle changes, such as avoiding drug-related situations, may be encouraged.

  o Identify and address low self-esteem, mood disorders, family problems, and other stresses.

  o One-to-one therapy, group therapy, and even hospitalization may be necessary components of the treatment plan. (Patients with uncomplicated marijuana use in the absence of other psychiatric or medical problems are rarely hospitalized.)



**Advancing the Management of Cardiovascular and Metabolic Risk Factors: The Role of the Endocannabinoid System**

**FREE COURSE!**

eMedicine invites you to take a series of free, interactive, case-based courses on the endocannabinoid (EC) system and the potential for multirisk management through its regulation.

**A 62-YEAR-OLD MAN WITH A HISTORY OF HYPERTENSION**

The first course describes the case of James H—, a 62-year-old white man who presents for a routine new patient examination. He has a long-standing history of hypertension. About a year ago, he underwent an urgent percutaneous coronary intervention (PCI) after experiencing angina. Since then, James has stopped smoking. He is able to go on walks with his wife but is somewhat limited by knee pain. (This activity is approved for AMA PRA Category 1 Credit.)

REVIEW COURSE DETAILS ▸▸    TAKE THIS COURSE NOW ▸▸

| MEDICATION | Section 7 of 11 〖Back  Top  Next〗 |
|---|---|

Author Information Introduction Clinical Differentials Workup Treatment Medication Follow-up Miscellaneous Pictures Bibliography

Short-term, low-dose BZ treatment for acute intoxication has been used. Chronic psychosis associated with marijuana use (coded in the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition [DSM-IV]* as either cannabis-induced disorder with delusions or cannabis-induced disorder with hallucinations) may require antipsychotic treatment. Drug therapies that diminish cravings for marijuana or intoxicating effects from marijuana use currently are not available.

Drug Category: *Anxiolytics* -- Depress all levels of CNS, which in turn reduce anxiety symptoms.

| Drug Name | Lorazepam (Ativan) — Treatment of acute marijuana-associated panic or anxiety symptoms. Monitor vital signs carefully after administration. Watch for respiratory depression, ataxia, and somnolence/excess sedation. Amnesia may follow administration. Effects usually last 5-8 h after administration. Sedative hypnotic with short onset of effects and relatively long half-life. Increasing the action of GABA, which is a major inhibitory neurotransmitter in the brain, may depress all levels of CNS, including limbic and reticular formation. When patient must be sedated for more than a 24-h period, this medication is excellent. |
|---|---|
| Adult Dose | 0.5-1 mg PO/IV q3-4h prn to resolve symptoms; not to exceed 4 mg in 24 h |
| Pediatric Dose | 0.05 mg/kg/dose q4-8h |
| Contraindications | Documented hypersensitivity, preexisting CNS depression, hypotension |
| Interactions | Toxicity of BZs in the CNS increases when used concurrently with alcohol, phenothiazines, barbiturates, and MAOIs |
| Pregnancy | D - Unsafe in pregnancy |
| Precautions | Caution in renal or hepatic impairment, myasthenia gravis, organic brain syndrome, or Parkinson disease |

| FOLLOW-UP | Section 8 of 11 〖Back  Top  Next〗 |
|---|---|

Author Information Introduction Clinical Differentials Workup Treatment Medication Follow-up Miscellaneous Pictures Bibliography

**Further Outpatient Care:**

- Follow-up care should be comprehensive and involve specialist services such as those provided by drug treatment units.

  o Treatment includes behavior therapy (aimed at reducing the chances of reexposure and establishing coping mechanisms to resist further use); family, group, and individual therapy; and periodic testing of urine to monitor abstinence.

  o Narcotics Anonymous (NA) is a self-help group organized on principles similar to Alcoholics Anonymous and is useful in helping addicts maintain abstinence.

7

  ○ Adolescent drug programs usually focus on promoting communication skills and age-appropriate behaviors.

**Deterrence/Prevention:**

- School-based programs and peer-led groups may be useful in primary prevention of marijuana abuse.

**Complications:**

- Marijuana use may be complicated by comorbid substance use and medical problems as outlined.

- Marijuana abuse may result in infants with low birth weights.

- THC is soluble in breast milk and can be passed to infants.

**Prognosis:**

- As with other substance abuse conditions, relapse is common, and treatment may be necessary for multiple episodes.

**Patient Education:**

- Inform patients about the possible carcinogenic properties of marijuana.

- The role of marijuana as a gateway drug must be emphasized to users. Complete abstinence is the goal.

- For excellent patient education resources, visit eMedicine's Substance Abuse Center. Also, see eMedicine's patient education articles Drug Dependence and Abuse and Substance Abuse.

| MISCELLANEOUS | Section 9 of 11  〖Back  Top  Next〗 |
|---|---|

Author Information Introduction Clinical Differentials Workup Treatment Medication Follow-up Miscellaneous Pictures Bibliography

**Medical/Legal Pitfalls:**

- Failure of physicians to recognize cannabis abuse is common. People who use marijuana generally have no stigmata of marijuana abuse, and a high index of suspicion and careful urine testing may be needed to diagnose such abuse.

- Marijuana abuse may be a factor in vehicle or machinery accidents because intoxication affects coordination and motor performance. Perform the appropriate tests for use of marijuana after these accidents.

- Cannabis intoxication may be associated with dysphoric, irritable, or aggressive mood changes. Carefully examine patients for evidence of suicidality and homicidality, document presence or absence thereof, and manage as indicated.

| PICTURES | Section 10 of 11  〖Back  Top  Next〗 |
|---|---|

Author Information Introduction Clinical Differentials Workup Treatment Medication Follow-up Miscellaneous Pictures Bibliography

**Caption:** Picture 1. *Cannabis sativa*



View Full Size Image

eMedicine Zoom View (Interactive!)

**Picture Type:** Photo

**Caption:** Picture 2. The major psychoactive component of marijuana is tetrahydrocannabinol (THC).

Click to see larger picture

View Full Size Image

eMedicine Zoom View (Interactive!)

**Picture Type:** Graph

**Caption:** Picture 3. Adverse physical and psychological manifestations associated with marijuana use

Click to see larger picture

View Full Size Image

eMedicine Zoom View (Interactive!)

**Picture Type:** Graph

8

Caption: Picture 4. Percentage of 8th-grade students who have used marijuana

[x] Click to see larger picture    View Full Size Image

                                   eMedicine Zoom View (Interactive!)

Picture Type: Graph

Caption: Picture 5. Percentage of 10th-grade students who have used marijuana

[x] Click to see larger picture    View Full Size Image

                                   eMedicine Zoom View (Interactive!)

Picture Type: Graph

Caption: Picture 6. Percentage of 12th-grade students who have used marijuana

[x] Click to see larger picture    View Full Size Image

                                   eMedicine Zoom View (Interactive!)

Picture Type: Graph

| BIBLIOGRAPHY | Section 11 of 11  [Back  Top |
| --- | --- |

Author Information  Introduction  Clinical  Differentials  Workup  Treatment  Medication  Follow-up  Miscellaneous  Pictures  Bibliography

- DuPont RL: Examining the debate on the use of medical marijuana. Proc Assoc Am Physicians 1999 Mar-Apr; 111(2): 166-72 [Medline].
- Ghodse H, ed: Drugs and Addictive Behaviour. Blackwell Scientific Publications: 1989.
- Giannini AJ, ed: Drugs of abuse. 2nd ed. Los Angeles, CA: Practice Management Information Cooperation; 1997.
- Greenfield SF, O'Leary G: Sex differences in marijuana use in the United States. Harv Rev Psychiatry 1999 Mar-Apr; 6(6): 297-303 [Medline].
- Hales RE, Yudofsky SC, Talbott JA , eds.: American Psychiatry Press Textbook of Psychiatry 1994. 2nd ed. Washington DC: American Psychiatry Press, Inc: 1994.
- Klein TW, Friedman H, Specter S: Marijuana, immunity and infection. J Neuroimmunol 1998 Mar 15; 83(1-2): 102-15[Medline].
- Kranzler HR, Rounsaville BJ, ed: Dual Diagnosis and Treatment. New York: Marcel Dekker, Inc: 1998.
- Lyketsos CG, Garrett E, Liang KY: Cannabis use and cognitive decline in persons under 65 years of age. Am J Epidemiol 1999 May 1; 149(9): 794-800[Medline].
- McCardy BS, Epstein EE, eds.: Addictions: a comprehensive guidebook. New York: Oxford University Press: 1999.
- Miller NS, ed: The Principles and Practice of Addictions in Psychiatry . Philadelphia, PA: W.B. Saunders Company: 1997.
- Ungerleider JT: Marijuana: still a "signal of misunderstanding". Proc Assoc Am Physicians 1999 Mar-Apr; 111(2): 173-81[Medline].

NOTE:

Medicine is a constantly changing science and not all therapies are clearly established. New research changes drug and treatment therapies daily. The authors, editors, and publisher of this journal have used their best efforts to provide information that is up-to-date and accurate and is generally accepted within medical standards at the time of publication. However, as medical science is constantly changing and human error is always possible, the authors, editors, and publisher or any other party involved with the publication of this article do not warrant the information in this article is accurate or complete, nor are they responsible for omissions or errors in the article or for the results of using this information. The reader should confirm the information in this article from other sources prior to use. In particular, all drug doses, indications, and contraindications should be confirmed in the package insert. FULL DISCLAIMER

Cannabis Compound Abuse excerpt

About Us | Privacy | Terms of Use | Contact Us | Advertise | Institutional Subscribers

HON We subscribe to the
@    HONcode principles of the
code Health On the Net Foundation

© 1996-2007 by WebMD.
All Rights Reserved.

9

# EXHIBIT C

1  FAY ARFA, A LAW CORPORATION
   Fay Arfa, Attorney at Law
2  State Bar No. 100143
   10100 Santa Monica Blvd., #300
3  Los Angeles, CA 90067
   Tel.: (310) 841-6805
4  Fax: (310) 841-0817

5  Attorney for Defendant
   TIMOTHY DRIGGARS
6
7              SUPERIOR COURT FOR THE STATE OF CALIFORNIA

8                          COUNTY OF ORANGE

9  PEOPLE OF THE STATE OF CALIFORNIA,        )  Case No. 05CF0777
                                             )
10                     Plaintiff,            )  DECLARATION OF JODY A.
                                             )  WARD, Ph. D.
11         v.                                )
                                             )
12 TIMOTHY DRIGGARS,                         )
                                             )
13                     Defendant.            )
                                             )
14 _____  )

15         I, Jody A. Ward, declare as follows:

16 1.    I am a Clinical and Forensic psychologist licensed to practice in California.

17 2.    I earned my Doctor of Philosophy degree in Clinical Psychology from Biola

18       University, in La Mirada, California.

19 3.    I am on the Superior Court Panel of Expert Witnesses in Orange and San

20       Bernardino counties. I am also a member of the Orange County Juvenile

21       Court Panel of Expert witnesses and a member of the Board of Prison

22       Terms Independent Evaluators.

23 4.    In 2002, I served as an Adjunct Professor at Pepperdine University,

24       Department of Graduate School of Psychology and Education teaching

25       cognition assessment.

26 5.    Since 2006, I have served as an Adjunct Professor, at the Argosy

27       University Graduate School of Psychology, teaching personality

28       assessment, substance abuse, and criminal psychology.

                                    1

                  DECLARATION OF JODY A. WARD, Ph. D.

6.     From 1990 until 1994, I served as a deputy probation counselor in the Orange County Juvenile Hall.

7.     I have written one published article and have made several international presentations dealing with post-traumatic symptomology.

8.     I reviewed the medical records, trial transcripts and the police reports in the above case.

9.     Based on my review of the documents, I determined that several factors influenced Mr. Driggars behavior at the time of the offense.

10.     At trial, Mr. Driggars testified that he had been "hit up," meaning that he had been aggressively asked if he belonged to a rival gang, several times before the incident. He told the gang members that he was no longer involved in a gang and that his previous gang was in Orange County. He had been shot in the leg shortly afterwards, and six days before the alleged incident, he thought by the people who had been "hitting him up." Mr. Driggars purchased a loaded gun after the incident to protect himself.

11.     At trial, Mr. Driggars testified that, at about 6:30 p.m. in the evening, two Hispanic men were quickly approaching him in a parking lot, asking Mr. Driggars "where he was from," an aggressive way of determining rival gang membership. The men were yelling what sounded like "Latin Boys," a known gang in Orange County. While quickly approaching Mr. Driggars, one of the men pulled up his sleeve in an aggressive matter. Mr. Driggars testified that he reached in his car and pulled out a gun from behind a stereo speaker. While still sitting, he shot the gun in the direction of the men, wounding one in the stomach.

12.     Mr. Driggars also testified that he experienced much violence as a result of renouncing membership in the Lopers gang. While in jail awaiting trial for this offense, he was severely cut with a razor blade on his head, arms, back of the neck and his jawline. His Orange County Jail request for

2

DECLARATION OF JODY A. WARD, Ph. D.

1    medical attention stated he was attacked with a razor and received nine

2    lacerations.

3    3.    Based on the violence Mr. Driggars experienced just six days before the

4          event, it is very reasonable to assume that Mr. Driggars would have been

5          experiencing posttraumatic stress reactions which could have contributed

6          to an overreaction to the threat that the other men posed to him in the

7          parking lot.

8    4.    Research has shown there is "strong evidence that most people who are

9          recently exposed to a traumatic experience show a broad array of

10         posttraumatic stress reactions in the initial weeks after trauma." (Bryant, R

11         (2004), Assessing Acute Stress Disorder, *Assessing Psychological Trauma*

12         *and PTSD* (2nd Ed.) New York; Guilford.)

13   5.    Research shows that an exaggerated startle response has been

14         recognized as a core symptom of posttrauma reaction since the earliest

15         descriptions of posttraumatic stress, and it is one of the most reliably

16         reported symptoms following a traumatic event.  The exaggerated startle

17         response is a central element of posttraumatic symptoms, and is also

18         related to other hyperarousal symptoms.  There is evidence that the

19         exaggerated startle response is one of the first symptoms to emerge

20         following trauma exposure and is related to the hypervigilance often

21         reported after a traumatic event.  (Orr, S. Metzger, L., Miller, M. Kaloupek,

22         D. (2004) Psychophysiological Assessment of PTSD, *Assessing*

23         *Psychological Trauma and PTSD* (2nd Edition).  New York: Guilford.)

24   6.    The research shows that hypervigilance and hyperarousal are very

25         common post-traumatic symptoms.  In extreme states of hypervigilance,

26         the person filters his or her perceptions of the environment through a

27         screen of the trauma experience. Perception and information processing

28         are then filtered through the individual trauma encounter, which sifts out

3

DECLARATION OF JODY A. WARD, Ph. D.

1    irrelevant information and focuses attention on actions of others or in the

2    environment with the highest potential for danger and threat.

3    17.   Hypervigilance is a biologically conditioned response to the trauma and is

4          strongly reinforced by the survival of that event. "Thus, [posttraumatic]

5          hypervigilance is an automatic, psychologiologically determined response

6          pattern designed to adapt to the perception, or the existence of, threat to

7          the well being of the organism . . . However, extreme hyperarousal may

8          result in misperception of cues and lead to maladaptive responses,

9          including those with potential legal consequences." (Wilson, R. (2004).

10         PTSD and Complex PTSD: Symptoms, Syndromes, and Diagnoses.

11         *Assessing Psychological Trauma and PTSD* (2nd Edition). New York:

12         Guilford.) Post traumatic symptomology is characterized by "selective

13         cognitive sensitivity" to stimuli that remind the person of the traumatic

14         event.

15   18.   Based on my training, experience, research in the area of posttraumatic

16         stress, and my review of Mr. Driggars' trial transcripts, I formed the opinion

17         that Mr. Driggars likely was experiencing the exaggerated startle response,

18         hypervigilance, and hyperarousal, which characterizes posttraumatic

19         symptomology, when he shot at the Hispanic men in the parking lot.

20   19.   I formed my opinion based on the following facts: He had survived being

21         shot, a life threatening event, six days before this event. He purchased a

22         gun because he feared for his safety. When the Hispanic men approached

23         him, they yelled what sounded to Mr. Driggars like "Latin Boys," a known

24         gang in Orange County.

25   20.   In my opinion, it is very likely that Mr. Driggars could have overreacted to

26         the threat of these boys or misinterpreted the event based on his

27         hypervigilance and hyperarousal, very common manifestations of

28         posttraumatic stress. His testimony also showed that he had reason to fear

                                        4

                        DECLARATION OF JODY A. WARD, Ph. D.

1    his own gang members, because he was cut while in jail on his head, neck,

2    and arms because he renounced his gang membership.

3  21.    Based on the information available to me, I formed the opinion that Mr. .

4    Driggars would have benefitted from a psychological evaluation to

5    determine whether he was experiencing posttraumatic symptoms which

6    contributed to his perceptions and behavior at the time of the offense

7    I declare, under penalty of perjury, that the facts in the foregoing motion are

8    true and correct to the best of my knowledge.

9    Executed this February 13, 2007 at Tustin, California.

10

11

12    JODY A. WARD, Ph. D.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

DECLARATION OF JODY A. WARD, Ph. D.

# EXHIBIT D

1  FAY ARFA, A LAW CORPORATION
   Fay Arfa, Attorney at Law
2  State Bar No. 100143
   10100 Santa Monica Blvd., #300
3  Los Angeles, CA  90067
   Tel.: (310) 841-6805
4  Fax: (310) 841-0817

5  Attorney for Defendant
   TIMOTHY DRIGGARS

6
                    SUPERIOR COURT FOR THE STATE OF CALIFORNIA
7
                             COUNTY OF ORANGE
8

9  PEOPLE OF THE STATE OF CALIFORNIA,          )   Case No. 05CF0777
                                               )
                          Plaintiff,           )   DECLARATION OF JOSE
10                                             )   LOPEZ, Ph.D.
         v.                                    )
11                                             )
   TIMOTHY DRIGGARS,                           )
12                                             )
                                               )
13                        Defendant.           )
                                               )
14

15      I, Jose Lopez, declare as follows:

    1.  I was awarded a Ph.D. from Claremont Graduate University in Claremont, CA
16
        in 1982.
17
    2.  I have taught Chicano Studies at California State University at Long Beach
18
        (CSULB) for 35 years. The courses that I taught included Introduction 100,
19
        101, 105 (Chicano Identity) and 310 Chicano Thought.
20
    3.  I have also taught several courses dealing with criminal street gangs including,
21
        Comparative Gangs and Chicanos and the Law.
22
    4.  I currently serve as Professor Emeritus in the Chicano Latino Studies
23
        Department at CSULB.
24
    5.  I began my teaching career as an assistant professor at CSU Fullerton. Since
25
        1970, I have been teaching at CSULB as an assistant professor, professor and,
26
        currently as Professor Emeritus.
27
    6.  I am a member and U.S. representative for the Directorio RED Nacional de
28
        Investigadores Sobre Juventud, Centro de Investigacion y Estudios Sobre

        Juventud. This National/International network of gang researchers is based in

        Mexico, D.F., Mexico. Members are from every state in Mexico, with one

                                     1

                    DECLARATION OF JOSE LOPEZ, Ph.D.

1    representative each from Central America, South America, and the U.S.

2    7.    I am also a member of the National Association for Chicana and Chicano

3    Studies, presenting research papers on a regular basis.

4    8.    I have qualified as an expert in criminal street gangs in the Superior Courts of

5    California including Los Angeles, Kern, San Bernardino and Orange counties.

6    9.    I have published several papers in the area of criminal street gangs and gang

7    subculture.

8    10.   I reviewed the trial transcripts in the case of People v. Timothy Driggars.

9    11.   Based on the trial transcripts and my training and experience, I formed the

10   opinion that, before March 8, 2005, Mr. Driggars sought to leave the gang.

11   The following facts support my opinion: He became gainfully employed to

12   support his pregnant girlfriend with whom he was now living. He moved from

13   Santa Ana to North Hollywood.  He had talked to his parole officer about

14   leaving the gang and having his tattoos removed.

15   12.   I also formed the opinion, based on the trial transcripts, my training and

16   experience, that Mr. Driggars, began carrying a gun for his personal protection.

17   The following facts support my opinion: On December 26, 2005, Mr. Driggars,

18   a young white man raised within the Latino community of Delhi in Santa Ana,

19   was shot for no apparent reason in North Hollywood, CA. The bullet remained

20   lodged in his leg. Mr. Driggars was scared for his life and bewildered because

21   he did not know who or why he had been shot. Consequently, he bought the

22   gun to protect himself from another similar attack that might end his life or from

23   whomever wanted to harm him in the first place might come back to finish the

24   job.

25   13.   The trial transcripts showed that on March 8, 2005, Mr. Driggars stopped to buy

26   a coke with his pregnant girlfriend and her sister. Based on my training and

27   experience, a white male with two Latina females would be construed as an

28   affront to the Latino male image.

14.   The Latino male chauvinist image originated with the Spaniards in
Mediterranean Spain. Latino male chauvinism requires the Latino men to
protect the honor of their women.  According to the Latino male chauvinistic

2

DECLARATION OF JOSE LOPEZ, Ph.D.

culture, their women must be sexually pure.

15. In my opinion, based on my training, education and experience, a white man with two Hispanic women poses a threat to the purity of the Hispanic women. The white man is perceived as a threat to their purity and must be punished and taught a lesson.

16. In my opinion and consistent with the male chauvinistic Spanish code of honor, the facts show that two Latino men approached and begin aggressively, maddogging Mr. Driggars. This aggressive maddogging behavior is designed to send a message to Mr. Driggars to "stay away from our women."

17. Mr. Driggars perceived them approaching him aggressively. He responded by meeting honor with honor and, in light of his previous shooting, spontaneously grabbed the gun that he had hidden in the car. He fired the gun to protect himself and his women.

18. In my opinion, Mr. Driggars did not willfully engage in the incident to promote, further, or assist any gang. Similarly, Mr. Driggars did not engage in the incident for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.

19. The trial transcripts also show that, while in custody, Mr. Driggars expressed his desire to leave the gang. He was subsequently attacked by some of his homies, cutting him on the face. In my opinion, based on my training, education and experience, this is consistent with "jumping out."

20. In my opinion, the cutting of Mr. Driggars' face leaves him a marked man and this "scarlet letter" is taken with him to any prison that he goes and he will carry the sentence of a "green light." This means that any inmate who is armed is encouraged to attack him. Consequently, he is now housed in protected custody.

21. I evaluated Exhibits 12b, 12c and 12d. In my opinion, based on my training, education and experience, the lyrics expressed in the documents are nothing more than the exportation of gang culture to the general public.

22. In recent years, the wearing of gang clothing, the listening to and writing of

3

DECLARATION OF JOSE LOPEZ, Ph.D.

gang lyrics and other expressions of gang characteristics have moved into the mainstream of American pop culture. What has happened is that gang lyrics have become part of rap music.

23. Many young people today who have no gang affiliation whatsoever, listen to, write and enjoy gang and rap lyrics. People who have no gang affiliation also actively participate in the creation of this pop culture. The cultural lines between gang and rap music have become totally blurred and the two are totally indistinguishable.

24. In fact, Al Valdez, Chief Gang Investigator, for the Orange County District Attorney's office, holds this view. He writes in his book, *Gangs: A Guide to Understanding Street Gangs*, 3rd Ed. (1997-2000) on page 9: "What was exported throughout the county between 1989 and 1999 was the gang culture. This was done with the help of the music and movie industry and through the written and video media."

25. I agree with Al Valdez' opinion as expressed in Paragraph 23.

26. In my opinion, Mr. Driggers did not willfully possess the lyrics with the intent to promote, further, or assist any gang. Similarly, Mr. Driggars did not possess the lyrics for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.

I declare, under penalty of perjury, that the facts in the foregoing motion are true and correct to the best of my knowledge.

Executed this February 14, 2007 at Santa Ana, California.


JOSE LOPEZ, Ph.D.


4

DECLARATION OF JOSE LOPEZ, Ph.D.

# EXHIBIT E

1  FAY ARFA, A LAW CORPORATION
   Fay Arfa, Attorney at Law
2  State Bar No. 100143
   10100 Santa Monica Blvd., #300
3  Los Angeles, CA 90067
   Tel.: (310) 841-6805
4  Fax: (310) 841-0817

5  Attorney for Defendant
   TIMOTHY DRIGGARS

6              SUPERIOR COURT FOR THE STATE OF CALIFORNIA
7                        COUNTY OF ORANGE

8  PEOPLE OF THE STATE OF CALIFORNIA,      )   Case No. 05CF0777
                                           )
9              Plaintiff,                   )   DECLARATION OF
                                           )   JESSICA LATUMETEN
10      v.                                  )
                                           )
11 TIMOTHY DRIGGARS,                        )
                                           )
12              Defendant.                  )
                                           )
13

14      I, Jessica Latumeten, declare as follows:

15 1.   I am a parole agent employed by the California Department of Corrections

16      and Rehabilitation.

17 2.   I supervised the parole of Timothy Driggars.

18 3.   I reviewed my case file on Timothy Driggars.

19 4.   My supervision notes show that on February 22, 2005, at 8:30 a.m., during

20      a home visit, I had a conversation with Timothy Driggars. During the

21      conversation, Mr. Driggars spoke to me about removing his tattoos.

22      I declare, under penalty of perjury, that the facts in the foregoing motion are

23 true and correct to the best of my knowledge.

24      Executed this February 13, 2007 at Santa Ana, California.

25

26

27      _Jessica Latumeten_ 02/15/07
        JESSICA LATUMETEN
28

                              1

             DECLARATION OF JESSICA LATUMETEN

STATE OF CALIFORNIA
RECORD OF SUPERVISION
CDC 1650D (Rev 8/96)

DEPARTMENT OF CORRECTIONS

**TYPE OF CONTACT**

\* RECORD ONLY FACE TO FACE CONTACTS WITH PAROLEE.

| CDC NUMBER | PAROLEE'S NAME |
|---|---|
| V43868 | Driggers, Timothy |

| AGENT OF RECORD | PAROLE OFFICE |
|---|---|
| Hatumeta | PAR 2 |

| DATE | TIME | A DATE AND TIME ENTRY IS REQUIRED ON ALL CONTACTS |
|---|---|---|
| 04/26/05 | 7:30a | att h/c @ ROR, n/c. Met w/ "D" q mother Nancy Kingster who reports "D" leaves early to get work, then works 2nd job helping out at a restaurant. She says "D" is doing well. Hatumeta |
| 05/16/05 | 4:30p | h/c @ ROR w/ "D" Cursory of residence was neg. "D" got a car & provided info. "D" still gets some work through day labor, type agencies & helps out at "D" q father's restaurant in Hollywood. Hatumeta |
| 05/16/05 | 1:20p | "D" @ NCIC/IAV, ANT D. D.O.T. deputies inquired about "D" status, info provided. Hatumeta |
| 06/10/05 | 11:40a | att h/c @ ROR, n/c. Hatumeta |
| 06/12/05 | 10:00a | att h/c @ ROR, n/c. Hatumeta |
| 06/22/05 | 8:30a | h/c @ ROR w/ "D". "D" q estranged wife to file for annulment next wk. "D" says car still in the shop & has been working very little recently as a result. D'ma says "D" is still doing well. Requested info for tattoo removal. Hatumeta |
| 06/26/05 | 8:00a | "D" @ NCIC/IAV, ANT D. Hatumeta |
| | | att h/c @ ROR, n/c. ROR supervisor says "D" may not be staying @ ROR consistently. Hatumeta |

# EXHIBIT F

# MEDICAL

INTAKE SCREEN

RANGE COUNTY JAIL
         DRIGGARS,TIMOTHY LEE
ORRECTIONAL MEDICAL SERVICES
OUSING: IMININ
rinted by the CHART Medical Record System on:
         3/10/2005

NAME:

SEX:  M  DOB:   04/04/84
BKG#: T41245N

/10/2005 16:58  SITE IRC TRIAGE   TYPE INTAKE SCREEN   CLINIC VISIT
    MANACMUL,MARIO,RN  entered by:MANACMUL,MARIO,RN

### DIAGNOSES/PROBLEMS

LLJ3      OTHER MEDICAL PROBLEMS OR INJURIES
             GSW WITH BULLET IN MEDICALLY CLEARED AT WMCA LAST NIGHT
_.S3      PRESCRIBED MEDS - INCL PSYCHIATRIC AND BCP
             KEFLEX ??? BID
LCZ6      RASH CUTS SORES BOILS OR ABSCESSES
             GSW
LJT9      HOSPITALIZATION WITHIN PAST 3 MONTHS
             LAST NIGHT GSW

### PHYSICAL EXAM

ACV1      TEMPERATURE            97.7
ADA1      PULSE                  94
AFL1      RESPIRATORY RATE       18
AEF1      BLOOD PRESSURE         130/72

### TESTS

`A2     PULSE OXIMETER                     97%

### ADMINISTRATIVE

RGX9-M    TRIAGE DISPOSITION MEDICAL
RHZ2-HTN  WORK STATUS AND TRANSFER STATUS CMS -PENDING- HOLD FOR FOLLOW UP
             NO TRANSFER - MEDICAL NO WORK

ORANGE COUNTY HEALTH CARE EN

Correctional Medical Services

| CLINICAL RECORD --- PROGRESS NOTES |
| --- |

Name _Driggars, Timothy_  Booking Number _2240918_  Date of Birth _4 48?_

| Date | Time | ALLERGIES: |
| --- | --- | --- |
| 3/10/05 | | MD Triage |
| | FROS | H/o GSW 10 days ago |
| | | seen @ W Anten Med |
| | | Meds ⊘ |
| | | Social: denies ETOH, GTO ⟋ |
| | | |
| | | VS- BP 160/70 |
| | | |
| | | Cft clear |
| | | Heart rrll |
| | | ® leg GS W healed min - swelling |
| | | |
| | | A/P: GSW |
| | | ↳ per order |
| | | V₃ 1 bentos |
| 3/11/05 | 1ce | ros SC |
| | | Ⓢ pain c̄ time 5-7/10 |
| | | ⎯ ⊕ cerury ® leg |
| | | ant HT c̄ ⊕ scoline |
| | | Ⓒ Steroid spic fully |
| | | Bcry ⊕ edem/erehey o's & s₁ |
| | | ⊕ infu |
| | | Ⓐ ® Hep pm |
| | | ® edem/cn on desires /pul m |
| | | norm S? |

5272 26 1702 (12/79)

| Date | Time | ALLERGIES: NKDA |
|------|------|------------------|
| 3-24-5 | 0950 | RNSC |
| | | Saw a shot-low Immuniz Med |
| | | special 800 |
| | | O - 97.7 - 55 - 18 - 110/60 |
| | | Amb c̄ steady gait |
| | | Examed ↓ Ⓡ Ⓛ |
| | | next to ankle-outer |
| | | c̄ Ⓞ finger object |
| | | under Jole Skin |
| | | Ø erythema |
| | | Ø sign infectn |
| | | A: r/o FBSN |
| | | P- MDE to eval p̄ |
| 3/25/05 | 0720 | at count. R/S sub call to 3/25/05 pm |
| | | Patsy Wallace RN |
| 3/25/05 | 0918 | US for MD/NRSC T 97⁵ P 59 R 16 BP 105/65 |
| | | A.Wallace  Patsy Wallace RN ✓ |
| 3/28/05 | 1000 | WRSC |
| | | Said was shot on Ⓡ Lower Leg |
| | | ~ 3 weeks Ago. Bullet still Lodged |
| | | on Leg. Said walking c̄ Jail Issue |
| | | shoes gives him pain. Wants own |
| | | shoes |
| | | O  T |
| | | Well healed Ⓡ PaTella scar. |
| | | Healed wound Ⓡ proximal Tibia, |
| | | and palpable FB on Ⓡ Lower |
| | | calf. Unremarkable Leg Exam, Foot |
| | | Exam |

GERRY DE JESUS, N.P.

(3.)

12/26/05 15:51
    DOCUMENT ID: 416240   TIMESTAMP: 051226130916494

```
==================================
DOE, JOIN 25135              M 21
MEDREC NUMB: 90320045
ACCOUNT NUM: 90000815971
CURRENT LOC: 461903    4S
==================================
```

ADM Date: 12/26/2005 Patient: DOE, JOIN 25135 MR#:
0-903-20-04
 OPERATIVE REPORT


Date of Operation: 12/26/05

Preoperative Diagnosis(es): Multiple complex lacerations to head, face,
neck, and
left upper extremity.

Postoperative Diagnosis(es): Multiple complex lacerations to head,
face, neck, and left upper extremity.

Operation Performed: Multiple complex laceration closure.

Surgeon(s): Christopher T Lane,
MD(A); Bardia A Anvar, MD(R4); Richard
Shih, MD(R1).

Anesthesia: General.

Consent: Proper informed consent was obtained from the patient and is
in the chart.

Estimated Blood Loss: 100 cc.

Drains: None.

IV Fluids: Crystalloid 1 L.

Complications: None immediate.

Disposition: Stable to the recovery room.

Indications: A 21-year-old male inmate on trial
for murder who was
assaulted and sustained multiple complex lacerations to his head, face,
neck, and left upper extremity.

Findings: Multiple complex lacerations.

Procedure in Detail: After proper informed consent,
the patient was
taken to the operating room. Once the patient was cleared clinically

CONTINUED

```
==============================================================
```

12/26/05 15:51                    (QXS$$P)
     DOCUMENT ID: 416240  TIMESTAMP: 051226130916494

```
====================================
DOE, JOIN 25135              M 21
MEDREC NUMB: 90320045
ACCOUNT NUM: 90000815971
CURRENT LOC: 461903    4S
====================================
```
and radiologically for C-spine injury, the patient was intubated and put
under general anesthesia while supine.
The patient's left forearm was
washed out with copious amounts of sterile saline after being prepped
with Betadine in the usual sterile fashion. It was then closed with
staples. After this, attention
was directed at the patient's head and
face. This was prepped and draped in the usual sterile fashion. A 7-cm
laceration in the left cheek was closed with 5-0 fast absorbed gut. A
laceration of the right ear which included a fracture of
the cartilage
was repaired with 4-0 Vicryl in the cartilage, and then 5-0 fast
absorbing in the overlying skin. The complicated left scalp laceration
was irrigated with copious amounts of sterile
normal saline. The fascia
was approximated with a running 4-0 Vicryl suture, and then the skin
overlying that was closed with staples.

The patient was then flipped to the prone position, so that
attention
could be focused on his posterior laceration. The patient was
re-prepped and draped in the usual sterile fashion, and the surgeons
were re-gowned and re-gloved in the usual sterile fashion. The
posterior left triceps laceration was irrigated out with copious amounts
of sterile normal saline. The fascial layer was closed with
interrupted
3-0 Vicryl deep sutures, and the overlying skin was closed was closed
with staples. The occipital/posterior neck lacerations were then closed
with staples after being irrigated out with
copious amounts of sterile
normal saline.

The total length of the lacerations closed were as follows: Left cheek
laceration 7 cm, right ear laceration 3 cm, left forearm laceration 5
cm, posterior
left triceps laceration 4 cm, and posterior neck/occipital
lacerations 8 cm and 8 cm. All of the closed lacerations were then
treated with a thin layer of bacitracin ointment, and the posterior
neck/occipital wound was dressed with 4 x 4 and an ABD. The patient
tolerated the procedure well and was stable on the way to the
recovery
room.


Unreviewed
_____

                              CONTINUED
```
====================================================================
DOE, JOIN 25135            90320045              DICTATED REPORT
```

12/26/05 15:51            (QXS$$P)                    PAGE 003
    DOCUMENT ID: 416240  TIMESTAMP: 051226130916494

====================================
DOE, JOIN 25135              M 21
MEDREC NUMB: 90320045
ACCOUNT NUM: 90000815971
CURRENT LOC: 461903      4S
====================================

Richard Shih MD(R) Christopher T. Lane MD(A)
Dept. of Surgery Dept. of Surgery
Division of Trauma Critical Care
 Assistant Clinical Professor


cc: Christopher T. Lane
 Richard Shih


000512030/803094/33758
DD: 12/26/2005 10:59 A
DT: 12/26/2005 11:21 A

                              LAST PAGE

 -*-

12/26/05 15:52                    (QXS$$P)
      DOCUMENT ID: 416224   TIMESTAMP: 051226083934464

```
==================================
DOE, JOIN 25135          M 21
MEDREC NUMB: 90320045
ACCOUNT NUM: 90000815971
CURRENT LOC: 461903     4S
==================================
```

Lungs: Clear to auscultation.
Heart:
Regular rate and rhythm.
Abdomen: Soft, nondistended, nontender.
GU/Rectal: Rectal examination otherwise negative.
Extremities: He has a 5-cm laceration to the left triceps, 4-cm
laceration to the left forearm, and a 4-cm superficial laceration to the
right forearm.
Back: No evidence of any entry or penetrating wounds.
Neurological: He is A O x4. No focal deficits. His GCS is
15.
Vascular: His pulses are intact.

Diagnostic Data: Chest x-ray is negative. CT of the head and C-spine
is pending. Hemoglobin was 12.3 and 12.1.

Impression: Status post multiple stab
wounds.

Plan: Will get a CT of the head to rule out intracranial injury, CT of
the C-spine to clear his neck, and a CT angio of the neck to rule out
any arterial injury, and then we will take him to the operating room and
repair his
lacerations.


Unreviewed

_____

Bardia A. Anvar MD(R) Christopher T. Lane MD(A)
Dept. of Surgery Dept. of Surgery
 Division
of Trauma Critical Care
Assistant Clinical Professor


cc: Bardia A. Anvar
 Christopher T. Lane


000512005/799735/33984
DD: 12/26/2005 7:55 A
DT: 12/26/2005 8:16 A
```

                                    LAST PAGE
```
==========================================================
DOE, JOIN 25135           90320045           DICTATED REPORT
```

--*--

(7)

# EXHIBIT G

EXHIBIT NO. _1__

Case No. _OSCFO777_

☑ ID,   Date _3-14-06_
☐ IN EVIDENCE   Date _3-14-06_

☐ Plaintiff/People   ☑ Defendant   ☐ Joint
☐ Petitioner   ☐ Respondent   ☐ Court
☐ Other _____

_People_

vs.

_Timothy Briggan_

SIGNATURE - Attorney/Party Introducing Sensitive Exhibit

ALAN SLATER, Clerk of the Court
By _____, Deputy
NOTE: THIS ITEM IS A PERMANENT COURT RECORD.
DO NOT REMOVE FROM COURTROOM.

F0363-2174 (R8/99)

RUIZ:            (Inaudible) right?

DRIGGERS:        (Inaudible).

RUIZ:            (Inaudible).

DRIGGERS:        Yeah.

RUIZ:            What's your last name (inaudible).

DRIGGERS:        R-I.

RUIZ:            D-R-I.

DRIGGERS:        G-G (inaudible).

**(UNINTELLIGIBLE)**

DRIGGERS:        65867.

RUIZ:            (Inaudible).

DRIGGERS:        65867 (inaudible) D-R-I-G-G (inaudible).

RUIZ:            What's your phone number (inaudible).

DRIGGERS:        949-981-9874.

RUIZ:            981-98.

DRIGGERS:        74.

RUIZ:            (Inaudible) social security number?

DRIGGERS:        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.

RUIZ:            Are you on probation or parole?

DRIGGERS:        Parole.

RUIZ:            CDC or CYA?

DRIGGERS:        Both, I discharged CYA (inaudible)…two weeks ago.

RUIZ:            (Inaudible).

T12

05-10546         INTERVIEW WITH TIMOTHY DRIGGERS         3

DRIGGERS:      Yeah.

RUIZ:      Do you have a parole agent assigned to you?

DRIGGERS:      Yeah.

RUIZ:      Who's your parole agent?

DRIGGERS:      Latumeten…

RUIZ:      Matin?

DRIGGERS:      Agent Latumeten L A T U M E T E N

RUIZ:      What are you on parole for?

DRIGGERS:      Uh assault deadly weapon person (inaudible).

RUIZ:      (Inaudible) I mean (inaudible) with Lopers (inaudible).

(UNINTELLIGIBLE)

RUIZ:      Do you have any tattoos?  None (inaudible).

(UNINTELLIGIBLE)

RUIZ:      You've been arrested before (inaudible) rights (inaudible) okay.  You're under arrest for investigation of attempted murder.  You have the right to remain silent.  Do you understand?

DRIGGERS:      (Inaudible).

RUIZ:      Yes or no?

DRIGGERS:      Yea.

RUIZ:      Anything you say may be used against you in court.  Do you understand?

DRIGGERS:      Yes.

RUIZ:      You have the right to an attorney before and during any questioning.  Do you understand?

DRIGGERS:      Yes.

T13

05-10546                    INTERVIEW WITH TIMOTHY DRIGGERS                           4

RUIZ:          If you cannot afford an attorney, one will be appointed for you before questioning, if you wish. Do you understand?

DRIGGERS:      Yes.

(UNINTELLIGIBLE)

RUIZ:          10546 (inaudible) okay. I'm going to ask you questions. We're going to talk about what happened. You want to talk to me? Yes or no?

DRIGGERS:      I don't give a fuck I'll talk to you.

RUIZ:          What happened?

DRIGGERS:      What do you mean what happened? (inaudible).

RUIZ:          You're here because of a shooting incident, okay.

DRIGGERS:      Okay.

RUIZ:          (Inaudible) just tell us about what happened. What happened? (inaudible).

DRIGGERS:      (Inaudible) What happened. Grandmother house went to the pool I was coming back to Hollywood to take them home. (inaudible) my gas was low (inaudible) got off on Santa Ana Blvd...Like I told I don't know what the fuck his name was the bald guy...Viramontes I think it was (inaudible) went to the gas station...(inaudible) I started to pump the gas, and the cops came and got me.

RUIZ:          (Inaudible) Lopers and 5th Street. How did you get involved with Lopers and 5th Street?

DRIGGERS:      (Inaudible) well, what does that have to do with anything (inaudible) got out that's when I was fucking 11 years old (inaudible).

RUIZ:          You weren't...you weren't visiting somebody down there that got shot?

DRIGGERS:      (Inaudible) somebody hit or got shot?

RUIZ:          Yeah.

DRIGGERS:      No.

RUIZ:          (Inaudible) got out of the hospital, he got shot.

DRIGGERS:      No. (Inaudible).

T14

05-10546

RUIZ:          (Inaudible).

DRIGGERS:      No.

RUIZ:          No?

DRIGGERS:      No.

RUIZ:          Okay.  Did you shoot anybody today?

DRIGGERS:      No.

RUIZ:          Okay (inaudible).

DRIGGERS:      (Inaudible).

RUIZ:          Okay.

DRIGGERS:      (Inaudible).

RUIZ:          (Inaudible).

DRIGGERS:      No.

RUIZ:          So you didn't shoot anybody today?

DRIGGERS:      No (inaudible).

RUIZ:          I already did.

DRIGGERS:      Huh?

RUIZ:          I already did.

DRIGGERS:      (Inaudible).

RUIZ:          (Inaudible).

DRIGGERS:      (Inaudible) shooting back, you should know that there's no gunpowder on my hands (inaudible) right now.

RUIZ:          (Inaudible) Santa Ana.

DRIGGERS:      (Inaudible).

TIS

05-10546

INTERVIEW WITH TIMOTHY DRIGGERS                    6

RUIZ:           (Inaudible).

DRIGGERS:       My last residence um…1027 North Parton Street.

RUIZ:           Okay (inaudible).

DRIGGERS:       By Willard.

RUIZ:           Oh. That's up here by I don't know.

DRIGGERS:       Seventeenth.

RUIZ:           Yeah, but that's KPC area.  KPC sits right on (inaudible) okay (inaudible) Loper (inaudible).

DRIGGERS:       Did I ever live there?

RUIZ:           Yeah.

DRIGGERS:       Yeah.

RUIZ:           Where at?

DRIGGERS:       On Minter and Civic Center.

RUIZ:           Okay.  So that's how you got…that's how you got introduced to…to Lopers then?

DRIGGERS:       No.

RUIZ:           How did you get introduced into Lopers?

DRIGGERS:       My dad was one.

RUIZ:           Your dad? How old's your dad?

DRIGGERS:       Right now 40, 30, 40's.  My mom…

RUIZ:           I remember your dad.  You sure your dad's a Loper?  I thought he was something else for some reason.

DRIGGERS:       Nah, you're mistaking him something different, man.

RUIZ:           I've been doing gangs for 17 years.  I've seen a lot of people, okay.

DRIGGERS:       That's cool.

TM6

05-10546                 INTERVIEW WITH TIMOTHY DRIGGERS                      7

RUIZ:        Okay.  So I...maybe he...maybe he was just different, okay.  You're a white guy.

DRIGGERS:    Maybe.

RUIZ:        Do you know uh...Kevin, Kevin McCarthy.

DRIGGERS:    Rascal.

RUIZ:        Well, anyway, he's locked up right now.

DRIGGERS:    From Lopers.

RUIZ:        Yeah.  He's from Lopers.

DRIGGERS:    Yeah, I know who you're talking about.

RUIZ:        Yeah.  And he's another person that is not...not Hispanic that's with the Lopers.

DRIGGERS:    (Inaudible).

RUIZ:        Yeah, okay.  So you don't see too...he's from the Lopers.  You don't see too many white guys, okay.

DRIGGERS:    Uh huh.

RUIZ:        Um...did you get jumped in?

DRIGGERS:    What does all this have to do with a fucking shooting you're bringing me for?

RUIZ:        It has a lot to do.

DRIGGERS:    I'm just...

RUIZ:        Okay.  Let...let me just cut to the chase here, okay.  You have been identified as being involved in a shooting, okay.

DRIGGERS:    Okay.

RUIZ:        Uh...the girls, I've talked to them.  So has this officer here.

DRIGGERS:    Right.

117

RUIZ:          And then more or less given information also that indicates that you were involved in a shooting, okay.

DRIGGERS:      Okay.

RUIZ:          The bottom line is I need to find out why the shooting occurred at…it can make a real big difference.

DRIGGERS:      (Inaudible) it doesn't make sense but…

RUIZ:          Well, okay. Well, your girlfriend. What's her name?

DRIGGERS:      Claudia.

RUIZ:          Claudia.

DRIGGERS:      Yeah.

RUIZ:          She's pregnant, right?

DRIGGERS:      Yeah.

RUIZ:          Okay. Who's the father?

DRIGGERS:      Me.

RUIZ:          Okay. Do you know how old she is?

DRIGGERS:      Yeah.

RUIZ:          How old is she?

DRIGGERS:      Sixteen.

RUIZ:          Okay. Don't you think you kind of owe it to her to kind of at least just tell what happened? Do you have any kids?

DRIGGERS:      No.

RUIZ:          This is your first kid then, right?

DRIGGERS:      Yeah.

RUIZ:          Okay. It'd be nice if they're…if you could shed some light on this. If…if for some reason you felt it necessary to defend yourself of something like that because somebody was doing something that worried you, then, you know,

T.118

05-10546

that could give you a reason why you felt it necessary to shoot at somebody, okay. You're laughing, okay, so...so it's...

DRIGGERS:   It's...it's fucking...it's funny, the way you're saying that if and when...there was no fucking shooting.

RUIZ:   There was no shooting.

DRIGGERS:   I didn't shoot nobody.

RUIZ:   Okay. So you weren't...you were not involved in any type of confrontation today?

DRIGGERS:   No.

RUIZ:   In Santa Ana?

DRIGGERS:   No, I wasn't.

RUIZ:   Nobody...nobody...nobody confronted you...

DRIGGERS:   Only the cops that were digging through my letters and shit and...

RUIZ:   That's what we do, okay, we do shit like that, okay. I'm just saying that nobody had a confrontation with you today in Santa Ana?

DRIGGERS:   No.

RUIZ:   Nobody got in your face, got in your business?

DRIGGERS:   No.

RUIZ:   Okay. You didn't feel threatened in Santa Ana?

DRIGGERS:   Well, yeah, I did.

RUIZ:   Oh, you did.

DRIGGERS:   By the cops.

RUIZ:   Aside from the cops, okay, aside from the cops, did somebody rush you? Did some other gang members rush you? You know what I'm trying to get, I'm trying to get you to come out here, okay, at least to tell the truth or at least a small percent of the truth, okay.

DRIGGERS:   Well, I already told you the truth.

T19

INTERVIEW WITH TIMOTHY DRIGGERS                    10

RUIZ:           Okay. So you were not involved in a shooting at all today?

DRIGGERS:       No, I wasn't.

RUIZ:           Okay. No problem. I'm not going to bust my balls, you know, and I'm not going to bust your balls either going back and forth like the tattoos says, state raised, you know what time it is. You know what's going on. You know how I...I got to do and stuff like that. Okay.

(PICTURE BEING TAKEN)

RUIZ:           Go ahead and turn that way...that way (inaudible) stand up (inaudible) turn around, face the wall. The shooting that you got uh...sent to jail for um...what city did that shooting occur in?

DRIGGERS:       I was...I was never sent to jail for a shooting.

RUIZ:           Well what ever you went to jail for. You went to jail for uh...uh...a battery or something like that (inaudible).

DRIGGERS:       I went from Chino California Youth Authority to San Bernardino County Jail.

RUIZ:           No. What city arrested you for this crime? You got arrested by somebody. You went to a court. You got convicted of something and a petition got sustained.

DRIGGERS:       Like I went to the Youth Authority, okay, Chino California Authority YTS, Henry Stark.

RUIZ:           Okay.

DRIGGERS:       And I went to (inaudible) I went to (inaudible) San Bernardino County Jail (inaudible).

RUIZ:           So it happened (inaudible).

DRIGGERS:       Yeah, my last crime, yes.

RUIZ:           Okay. So it was within the institution.

DRIGGERS:       Yeah.

RUIZ:           Oh, okay. Okay. That makes sense. Okay (inaudible).

DRIGGERS:       Can I ask you a question?

T20

INTERVIEW WITH TIMOTHY DRIGGERS                    11

05-10546

RUIZ:        Yeah, go for it.

DRIGGERS:    Where's...where's my girlfriend right now?

RUIZ:        She's here right now.

DRIGGERS:    Yeah.

RUIZ:        She's okay.  She's real upset, I mean, obviously a person she loves is here.
             She doesn't want the person she loves to go to jail, you know, I understand
             where she's coming from but I wish the person that she loved would at least,
             you know, tell the truth about what happened.  But, you know, you're a man.
             You made your own mind up what you want to do or don't do, okay.

DRIGGERS:    Yeah.

RUIZ:        I'm not going to (inaudible).

DRIGGERS:    In other words, you're saying you want me to say, yeah, I'll go did this and
             that.

RUIZ:        No, no, you know what, I just want to say the truth, okay.  Now I tried to give
             you uh...an out.  Maybe...maybe something happened that you felt compelled.
             You know having the gun, obviously, it'd be a violation of your parole, okay,
             but that's the...the least of the problems, okay.  The problem is, is that
             somebody got shot but sometimes they have silly reasons why you shoot at
             people.  As a police officer, if I shoot somebody, if I kill him or, you know, it's
             justifiable if there's certain reasons, okay.  I'm just trying to explain to you...

DRIGGERS:    Oh, did you take a gun from me?

RUIZ:        Okay.

DRIGGERS:    Did you find any gun around me or anything?

RUIZ:        I can tell you're not listening, okay, I'm just trying to...trying to fit
             it...whatever.

DRIGGERS:    I'm going to be like this or what?

RUIZ:        Okay.  Excuse me.

DRIGGERS:    I'm still like this?

T21

# EXHIBIT H

EXHIBIT NO. _C_

Case No. _O5CF0777_

☒ ID   Date _3 14 06_
☐ IN EVIDENCE   Date _31406_

☐ Plaintiff/People   ☒ Defendant   ☐ Joint
☐ Petitioner   ☐ Respondent   ☐ Court
☐ Other _____

_People_

vs.

_Timothy Ranggur_

_____
SIGNATURE - Attorney/Party Introducing Sensitive Exhibit

ALAN SLATER, Clerk of the Court
By _____, Deputy

**NOTE: THIS ITEM IS A PERMANENT COURT RECORD.**
**DO NOT REMOVE FROM COURTROOM.**

F0363-2174 (R8/99)



05-10546                  INTERVIEW WITH TIMOTHY DRIGGERS                    2

RUIZ:        Is there room over there some place or...that's fine.  Good morning or afternoon I thought you'd be in County Jail.  I didn't know you were even here still.

DRIGGERS:    (Inaudible)...medical *I had some medical*

RUIZ:        (Inaudible)...what's wrong?

DRIGGERS:    I got shot like a week ago (inaudible). *shit a bullet*

RUIZ:        What uh...where did that happen at?

DRIGGERS:    In Hollywood.

RUIZ:        Oh, down at your house?

DRIGGERS:    Yeah.

RUIZ:        Well, did somebody from La Mirada shoot at you or what?

DRIGGERS:    Yeah.

RUIZ:        (Inaudible).

DRIGGERS:    (Inaudible). *I'm not sure who it was but.....*

RUIZ:        Did you make a report on that?

DRIGGERS:    Nah, I didn't want to...I didn't want to get violated.  I didn't want to get violated for getting shot.

RUIZ:        Well...well, I'm here because I got a call you want to tell me something.

DRIGGERS:    (Inaudible). *I talk to my ladies and they had them locked up too.*

RUIZ:        Both the girls, yeah.

DRIGGERS:    And uh (inaudible) if you guys can...can work with me now (inaudible) let you know (inaudible) you know what I'm saying? *what you wanted to know*

RUIZ:        Okay.  As long as it's truth, that's the bottom line.

DRIGGERS:    (Inaudible). *No bullshit*

RUIZ:        Okay.  Last night I read you your Miranda rights.  You still understand those?

INTERVIEW WITH TIMOTHY DRIGGERS                    3

05-10546

DRIGGERS:   Yeah.

RUIZ:       You still want to talk?

DRIGGERS:   Yeah.

RUIZ:       Okay.  Tell me.

DRIGGERS:   Well, I want…I want to know from you too (inaudible). *first…*

RUIZ:       On my word of honor, okay.  If I can get the girls off on any type of charges, I will, bottom line, okay um…my word of honor, okay.  My word's good as gold.  Tell me what happened.

DRIGGERS:   (Inaudible). *(Crying )*

RUIZ:       I…I know this is hard, man, but…

DRIGGERS:   What do you want to know?

RUIZ:       Where's the gun at?  To begin with.

DRIGGERS:   (Inaudible). *I still want to take your word for it, you know….*

RUIZ:       I'll tell you right now, I've been doing this for…I've been a police officer 27 years.  I've been in gangs for 17 years.  I…I…you can ask people, I'm good with my word, okay.  I'm not going to…I'm not going to back pedal.

DRIGGERS:   (Inaudible). *( crying )*

RUIZ:       All I want is the truth.  That's it, okay.  Did she have anything to do with it?

DRIGGERS:   (Inaudible). *(Crying ) No. I didn't even know it was gonna happen.*

RUIZ:       What happened?

DRIGGERS:   *Like I said before, ….       one side.* (Inaudible) shooting happened.  *I was* (inaudible) *when I shot.  I didn't even* know who he was (inaudible) ~~I shot him~~ (inaudible). *Nothing like that. He came banging on that shit…. and I shot him up to my bar.*

RUIZ:       Did he say he was from the neighborhood (inaudible)?

DRIGGERS:   (Inaudible). *I was scared for my lady.*

RUIZ:       What kind of gun did you have?

DRIGGERS:   .25. *( crying )*

*3.*

*T2*

05-10546                   INTERVIEW WITH TIMOTHY DRIGGERS                     4

RUIZ:        Okay. What happened afterward? *to get him the fuck away from me.*

DRIGGERS:    I took off. I just shot him once (inaudible) you know. *He was with another foo!*

RUIZ:        Just to let you know...

DRIGGERS:    (Inaudible).

RUIZ:        He's not dead, okay. So what happened afterwards? *I went around...*

DRIGGERS:    (Inaudible) I split (inaudible) take off. (Inaudible) house. I went up fucking (inaudible) Broadway and I went over to 17th and I went to the gas station *...my* (inaudible). *(crying)* *hands.*

RUIZ:        What did you do that for?

DRIGGERS:    (Inaudible). *To get the gun shot residue off.*

RUIZ:        So what happened next?

DRIGGERS:    Everybody showed up.

RUIZ:        Well, what happened to the gun?

DRIGGERS:    I hid it.

RUIZ:        Where?

DRIGGERS:    In the car.

RUIZ:        Okay. I was, you know...I was going to be looking at the car again, you know, I figured it might in the car (inaudible) gun (inaudible) I thought it was inside the car or outside the car. Where is it at?
             *speaker.*

DRIGGERS:    Right in the door (inaudible).

RUIZ:        Okay. Whose gun is it?

DRIGGERS:    *I got it after I* (inaudible) got shot.
             *In LA.*

RUIZ:        ^Okay (inaudible) where...where did you get shot at?
             ^

DRIGGERS:    In my leg.

RUIZ:        Okay. Why'd you come back to the neighborhood?

*(4)*
*13*

05-10546                    INTERVIEW WITH TIMOTHY DRIGGERS                          5

DRIGGERS:    I was (inaudible) Penguin *just got out of the hospital* and stuff.

RUIZ:        Penguin.  Did he got shot or something or what?

DRIGGERS:    Yeah.  He got shot (inaudible) *twice .... it was* was in the newspaper like a month and a half ago, got shot (inaudible).

RUIZ:        Yeah, okay.  How's he doing?

DRIGGERS:    He's great.  He can walk with a walker but…

RUIZ:        So he's at home now or what?

DRIGGERS:    Yeah.

RUIZ:        Did you actually uh…meet with him, talk with him or did you have a chance to do that?

DRIGGERS:    I stopped by (inaudible). *but he wasn't there yet.  My girlfriend...*

RUIZ:        Okay.  When you said this guy came up to you aggressively, did he come up to you or the car?

DRIGGERS:    Yeah, he was walking up to the car as I was getting out and as I seen him walking up but I stopped (inaudible) walked by me and (inaudible). *& watched*

RUIZ:        When he walked to the car, how far away were you from the car?  Like from here…

DRIGGERS:    I started walking from…okay.  Here (inaudible).

RUIZ:        (Inaudible) so I come from (inaudible) area.

DRIGGERS:    (Inaudible).

RUIZ:        Yeah.

DRIGGERS:    (Inaudible) across the street.  Okay, and (inaudible) and the sidewalk's right here, the parking lot's right here.  I was standing on the sidewalk probably 20' away.  I was walking up (inaudible) from here to (inaudible) a little bit farther than that wall (inaudible). *(crying)* *when I stopped*

RUIZ:        So how far?

DRIGGERS:    I don't even gang bang.  I don't even do none of that shit.

INTERVIEW WITH TIMOTHY DRIGGERS                6

05-10546

RUIZ:        How far were you from him when you shot him?

DRIGGERS:    Like from here.

RUIZ:        To the wall?

DRIGGERS:    A little bit farther.

RUIZ:        So 15' away.  This is…that's probably about…

DRIGGERS:    (Inaudible) 12 or 13 feet. *I'd say about*

RUIZ:        Was he by himself?

DRIGGERS:    No.

RUIZ:        Who…who was he with?

DRIGGERS:    I don't know *who he was with* (inaudible) you know what I'm saying? *I had more bullets in the clip. I had everything…. I would have killed him.*

RUIZ:        Uh huh.  What did he say to you?

DRIGGERS:    (Inaudible) where you fools from? Latin Kings or Latin Boys. I thought he said Latin Boys…but…from New York (inaudible), *my problem, these* another fucking strapped too, you know, he's walking up to the car.  People who walk up to cars like that are crazy unless they got something fucking (inaudible) you know what I'm saying? *keep them sure of themselves*

RUIZ:        Uh huh.  Well, who does the Lopers have problems with right now? *I'm telling you I haven't been….*

DRIGGERS:    Right now.  Fuck (inaudible) I've been working fucking I've been in Hollywood 24/7, man (inaudible) Mission Viejo (inaudible). *at the swimming pool at my grandma's house*

RUIZ:        So you're (inaudible) you're staying more often in Hollywood?

DRIGGERS:    Yeah (inaudible). *I come back to Hollywood. (crying)*

RUIZ:        (Inaudible) so you're saying that you're…you're not a Loper no more or what?

DRIGGERS:    Nah.  I didn't say that I was not (inaudible).

RUIZ:        You told me last night that you got involved when you were like 11 years old.

(6)

TS

# INTERVIEW WITH TIMOTHY DRIGGERS

DRIGGERS: Yeah.

RUIZ: You...you...what have you been arrested for?

DRIGGERS: Robbery, fucking (inaudible) trespassing. *escaping from placement*

RUIZ: When you got arrested for the robbery, where was that at, what city?

DRIGGERS: Uh...Mission Viejo.

RUIZ: Oh, Orange County Sheriffs then. How about trespassing?

DRIGGERS: All that shit in Mission Viejo.

RUIZ: You ever been arrested in Santa Ana?

DRIGGERS: No (inaudible).

RUIZ: Oh, so they got you here. When you worked at...for uh...the CYA, what was that for? For robbery?

DRIGGERS: Yeah (inaudible).

RUIZ: In...inside the institution, you got into a fight with somebody or...

DRIGGERS: Yeah. Later on.

RUIZ: Yeah.

DRIGGERS: (Inaudible) It was a riot.

RUIZ: So they prosecuted you for assault.

DRIGGERS: (Inaudible).

RUIZ: That was in YTS.

DRIGGERS: Yeah.

RUIZ: Where do you work at?

DRIGGERS: I was working at Video Finders and then (inaudible). *in Hollywood*

RUIZ: (Inaudible).

⑦

TL

INTERVIEW WITH TIMOTHY DRIGGERS    8

05-10546

*when I got shot I was trying to look*

DRIGGERS:    (Inaudible) restaurant at nighttime but they (inaudible) I was trying to (inaudible) get my car back and (inaudible).

RUIZ:    Um...you got shot a...a week ago in L.A.?

DRIGGERS:    Yeah.

RUIZ:    Today's the 9th.

DRIGGERS:    (Inaudible).

RUIZ:    (Inaudible) calendar out here.  It was Wednesday, right?

DRIGGERS:    (Inaudible).

RUIZ:    Was it the last Wednesday or was it...

DRIGGERS:    Yeah, it was last Wednesday.

RUIZ:    Okay, the 9th so (inaudible).

DRIGGERS:    (Inaudible).

RUIZ:    What time was it about when you got shot?

DRIGGERS:    (Inaudible).

RUIZ:    Morning or...

DRIGGERS:    No, at night.

RUIZ:    Nighttime.  Where at?  Do you know the streets?

DRIGGERS:    (Inaudible) know (inaudible).

RUIZ:    Was it by uh...her house (inaudible) she lives on Manzanita.

DRIGGERS:    *I know,*
(Inaudible) I was few streets away.

RUIZ:    (Inaudible).

DRIGGERS:    (Inaudible).

RUIZ:    Where did you get shot at, what leg?

DRIGGERS:    My right.

INTERVIEW WITH TIMOTHY DRIGGERS                    9

05-10546

RUIZ:           This one here?

DRIGGERS:       (Inaudible).

RUIZ:           Hollywood area?

DRIGGERS:       Mmm-hm.

RUIZ:           Did you report it to the police?

DRIGGERS:       Nah.  *(Crying)*

RUIZ:           Now when you guys were coming back from Mission Viejo, where you guys
                swimming at your grandma's house?

DRIGGERS:       Yeah.

RUIZ:           Oh, okay.  When you came to Santa Ana, you came to visit Penguin but he
                wasn't home?

DRIGGERS:       Yeah.

RUIZ:           Do you know who shot at Penguin?

DRIGGERS:       (Inaudible).  *Do I know who shot him?*

RUIZ:           Yeah.

DRIGGERS:       No.

RUIZ:           But he got hit by…

DRIGGERS:       (Inaudible).

RUIZ:           Yeah.  But he's paralyzed?

DRIGGERS:       No, he…he walks (inaudible).

RUIZ:           So, eventually he'll heal up.

DRIGGERS:       Yeah.

RUIZ:           (Inaudible) you said.

DRIGGERS:       (Inaudible).

*9.*

*T8*

INTERVIEW WITH TIMOTHY DRIGGERS                    10

05-10546

RUIZ:        Okay.  Did the guy who walked up to the car, did he have a gun?  Did you see a gun?

DRIGGERS:    (Inaudible).  *He had something in his pocket.*

RUIZ:        Um (inaudible) *Was he together with* the other guy?

DRIGGERS:    Yeah.

RUIZ:        Were...were they like right next to each other?

DRIGGERS:    Yeah.  They were and then like when they get about, about 2' before *me* (inaudible) got to him, they shot him, they were (inaudible).

RUIZ:        Did...did uh...did Claudia or um...Celine, did they know that you hid the gun in the car?

DRIGGERS:    No (inaudible) *That's where its at* right now.

RUIZ:        You peed on you hands because of the GSR.  Who told you about the GSR stuff?

DRIGGERS:    (Inaudible).

RUIZ:        Has everything you told me right now been the truth?

DRIGGERS:    Yeah.

RUIZ:        Have I forced you to say anything?

DRIGGERS:    No.

RUIZ:        Okay.  Okay.  I'm...I'll be talking with the D.A. this afternoon (inaudible) what we've talked about here and I have no problem whatsoever with uh...Claudia and...and Celine.  I'll...I'll tell her the facts of the case and if she believes that there is no liability on their part, she'll take the appropriate action.

DRIGGERS:    (Inaudible) that they told the guy that they were fucking gang related and all kinds of stuff (inaudible).

RUIZ:        Well, let me just tell you.  Last night, actually, from the information we had, which was ultimately what you just told me right now, you know, girls are involved in gangs too, okay.  And until I have all the facts and I don't know what their...their involvement is until the investigation...I take it as far as I

10/
19

can.  What you're telling…what you're telling me right now and all, you know, talking about the guys involved and this and that, if the girls are not involved, then there's no problem, okay.  I went to the house in Hollywood last night or this morning.  Nice family, okay.  They seem like a nice family.  I know the areas of Rampart uh…actually, it's a lot quieter there now than it used to be uh…but I know (inaudible) La uh…La Mirada's over there, 18th Street's over there and MS13, stuff like that.  But uh…but you got the gun for protection, is that what you got the gun for?  Now did somebody from La Mirada hit you up?  Or what?

DRIGGERS:   (Inaudible).   *what do you mean?*

RUIZ:   Well, how'd you get…when you got shot last week, what happened, somebody hit you up or what?

DRIGGERS:   Nah, they…they didn't hit me up.

RUIZ:   Who hit you up?

DRIGGERS:   They started shooting.

RUIZ:   For no reason whatsoever?  For what reason?

DRIGGERS:   I don't know, I mean, they seen me (inaudible).   *walking along and before I didn't… 2½ - 3 months*

RUIZ:   Okay.

DRIGGERS:   (Inaudible).

RUIZ:   Do uh…the gangs over there, do they know who Lopers are?

DRIGGERS:   Nah.   I (inaudible) that…that's why (inaudible) cousins used to be (inaudible). …   *when I starting writing to her*

RUIZ:   Oh, who was the cousin (inaudible).

DRIGGERS:   Their cousin, I mean, (inaudible).   *Claudias cousin was writing to her.*

RUIZ:   Oh, okay.  So (inaudible) letters and stuff like that.

DRIGGERS:   (Inaudible) yeah.

RUIZ:   Okay.  Okay.  Okay.  Tim, hang in there, okay.  Hang in there (inaudible) the guy's not dead and uh…my report's going to indicate you told the truth and came clean.  Now that's worth something, okay.  Okay (inaudible) okay.



T10

DRIGGERS:    Well, how long before they…before they get them out?

RUIZ:    Uh…that could be…you know, I can't…I can't tell you…I can't tell you specifically what date, what hour but it's something I'm going to be working on, okay. And uh…hopefully, it will come together correctly and they're not involved, they'll be out real quick like, okay. But you got to remember next time, you know, if you're with you lady or something like that, something like this goes down, you know, you just got to back off, get out of there.

DRIGGERS:    I was…I was thinking about protecting myself and her. I didn't want the cops (inaudible) you know what I'm saying?

RUIZ:    Yeah.

DRIGGERS:    (Inaudible) came back (inaudible) with my homeboy (inaudible) picked him up (inaudible) let's go (inaudible) you know.

RUIZ:    You'll be okay.

DRIGGERS:    (Inaudible). *I want to see my baby be born.*

RUIZ:    (Inaudible) *or baby will be born* okay. He'll be there, okay. You'll be there, maybe not in person, but there in spirit and he'll be there (inaudible) rest of your life.

DRIGGERS:    Okay.

RUIZ:    (Inaudible).          **(END OF INTERVIEW)**

Transcribed by SOA P. Wood #2652, 120105



# EXHIBIT I

FAY ARFA, A LAW CORPORATION
Fay Arfa, Attorney at Law
State Bar No. 100143
10100 Santa Monica Blvd., #300
Los Angeles, CA  90067
Tel.: (310) 841-6805
Fax: (310) 841-0817

Attorney for Defendant
TIMOTHY DRIGGARS

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>TIMOTHY DRIGGARS,<br><br>Defendant. | Case No. 05CF0777<br><br>DECLARATION OF NANCY JEAN KINGSTON |

I, Nancy Jean Kingston, declare as follows:

1. I am Timothy Driggars' maternal grandmother.

2. I testified as a witness for the defense during his criminal trial.

3. I could not testify to various matters because the trial court sustained the prosecutor's objections.

4. The trial transcript shows on Page 598, Lines 20 – 22, that I began to testify that Timothy had requested information about tattoo removal. I had a factual basis for my statement that Timothy had requested tattoo removal information from his probation officer. His probation officer conducted routine visits to my house. On one of her visits when I was present, I personally witnessed Timothy requesting information on tattoo removal. At a subsequent follow-up visit by his probation officer, and again in my presence, Timothy told his probation officer that he never received the information. She indicated that she forgot and that she would secure the

1

DECLARATION OF NANCY JEAN KINGSTON

1   information and send it to him.  On the day of the incident, Timothy picked
2   up the tattoo removal information that she had mailed to him.
3   5.   On Page 601, Line 14, I tried to testify about Timothy's reaction to his
4   mother's sudden death.  Timothy became very distraught over the death of
5   his mother.  Timothy was extremely attached to his mother.  Upon her
6   sudden and unexpected death, he became sad, withdrawn and more and
7   more despondent.  I suggested that he try to obtain grief counseling.  He
8   put in two requests for grief counseling with the Youth Authority that both
9   went unanswered.  I, then, tried to intercede with the Youth Authority on his
10  behalf.  Timothy requested that I not do so again because the Youth
11  Authority officials told him that he needed to grow-up, get over it, act like a
12  man, and stop whining to his grandmother.
13  6.   On Page 602, Lines 22-23, the prosecutor objected when I tried to explain
14  why I could not visit Timothy.  When Timothy was incarcerated, there were
15  several months when I was unable to visit him.  He was transferred by the
16  LA County Youth Authority to a lock-down mental health unit in San
17  Bernardino County due to a suicide attempt that resulted from the grief he
18  experienced following the death of his mother.
19  7.   On Page 603, Lines 1-10, the prosecutor objected when I tried to explain
20  Timothy's mood swings after the death of his mother.  I would have testified
21  that Timothy was in a very vulnerable emotional state after his mother's
22  death.  Since he was initially housed in Los Angeles County and then in a
23  San Bernardino County Youth Authority facility, he told me that youth
24  inmates with gang affiliations outside of Orange County viewed him as
25  potentially weak and vulnerable to their attacks, especially upon his
26  mother's death.  Timothy told me not to be upset when he began covering
27  himself with Orange County gang-affiliated tattoos and that it was
28  necessary for his self-protection from these other youth.  The tattoos

2

DECLARATION OF NANCY JEAN KINGSTON

1   demonstrated that he was strong and, in my opinion, helped mask his grief.

2

3   B.   On Page 606, Lines 9-10 and 20-21, the court sustained the prosecutor's

4   objection when I began to testify about why Timothy picked up the stack of

5   lyrics from my house. I would have testified that Timothy requested that I

6   save the rap lyrics because he intended to professionally record them and

7   pursue a recording contract. Timothy had a friend with professional

8   recording equipment and the first thing Timothy recorded upon his release

9   was a demo tape of rap lyrics that he had written in honor of his mother's

10   death.

11      I declare, under penalty of perjury, that the facts in the foregoing motion are

12   true and correct to the best of my knowledge.

13   Executed this February 13, 2007 at Mission Viejo, California.

14

15

16

17   NANCY JEAN KINGSTON

18

19

20

21

22

23

24

25

26

27

28

<div align="center">3</div>

---

<div align="center">DECLARATION OF NANCY JEAN KINGSTON</div>

# EXHIBIT J

Fay Arfa, A Law Corporation
10100 Santa Monica Blvd., #300
Los Angeles, CA  90067

# Fax

| To: | Federico Arturo DelaPena | From: | Fay Arfa |
|---|---|---|---|
| Fax: | (909) 392-5993 | Fax: | 310-841-0817 |
| Phone: | (909) 392-2121 | Phone: | 310-841-6805 |
| Date: | 2/13/2007 10:15 PM | Pages: | 2 |

Subject:  TIMOTHY DRIGGARS – SUBPOENA

Notes:

PLEASE CALL TO DISCUSS THE SUBPOENA.

THANKS.  FAY.

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address):*  TELEPHONE NO.:  FOR COURT USE ONLY

Fay Arfa
  10100 Santa Monica Blvd., #300
Los Angeles, CA  90067
  (310) 841-6805
ATTORNEY FOR *(Name):* TIMOTHY DRIGGARS

Insert name of court, judicial district or branch court, if any, and post office and street address:
Superior Court of the State of California
  for the County of Orange
  700 Civic Center Dr. West
Santa Ana, CA  92701

Title of Case: People v. Timothy Driggars

SUBPENA (CRIMINAL OR JUVENILE)

☐ DUCES TECUM

CASE NUMBER:
05CF0777

PEOPLE OF THE STATE OF CALIFORNIA, TO: FEDERICO ARTURO DE LA PENA

1. YOU ARE ORDERED TO APPEAR AS A WITNESS in this action at the date, time, and place shown in the box below UNLESS you make a special agreement with the person named in item 3:

a. Date: February 23, 2007   Time: 8:30 a.m.   ☒  Dept.: C-39   ☐ Div.:   ☐ Room:
b. Address: 700 Civic Center West, Santa Ana, CA  92701

2. AND YOU ARE
   a. ☒ ordered to appear in person.
   b. ☐ not required to appear in person if you produce the records described in the accompanying affidavit and a completed decla- ration of custodian of records in compliance with Evidence Code sections 1560, 1561, 1562, and 1271. (1) Place a copy of the records in an envelope (or other wrapper). Enclose your original declaration with the records. Seal them. (2) Attach a copy of this subpena to the envelope or write on the envelope the case name and number, your name and date, time and place from item 1 (the box above). (3) Place this first envelope in an outer envelope, seal it, and mail it to the clerk of the court at the address in item 1. (4) Mail a copy of your declaration to the attorney or party shown at the top of this form.
   c. ☐ ordered to appear in person and to produce the records described in the accompanying affidavit. The **personal attendance** of the custodian or other qualified witness and the production of the original records **is required** by this subpena. The proce- dure authorized by subdivision (b) of section 1560, and sections 1561 and 1562, of the Evidence Code will not be deemed sufficient compliance with this subpena.
   d. ☐ ordered to make the **original** business records described in the accompanying affidavit available for inspection at your business address by the attorney's representative and to permit **copying** at your business address under reasonable conditions during normal business hours.

3. IF YOU HAVE ANY QUESTIONS ABOUT THE TIME OR DATE FOR YOU TO APPEAR, OR IF YOU WANT TO BE CERTAIN THAT YOUR PRESENCE IS REQUIRED, CONTACT THE FOLLOWING PERSON BEFORE THE DATE ON WHICH YOU ARE TO APPEAR:
   a. Name: Fay Arfa                          b. Telephone number: (310) 841-6805

4. WITNESS FEES: You may be entitled to witness fees, mileage, or both, in the discretion of the court. Contact the person named in item 3 AFTER your appearance.

DISOBEDIENCE OF THIS SUBPENA MAY BE PUNISHED BY A FINE, IMPRISONMENT, OR BOTH, A WARRANT MAY ISSUE FOR YOUR ARREST IF YOU FAIL TO APPEAR.

FOR COURT USE ONLY

Date: February 13, 2007

(SIGNATURE OF PERSON ISSUING SUBPENA)

FAY ARFA
(TYPE OR PRINT NAME)

Atty
(TITLE)

(See reverse for proof of service)

Penal Code, § 1326 et seq.
Welfare and Institutions Code §§ 341, 664, 1727

SUBPENA
(CRIMINAL OR JUVENILE)

Form Adopted by Rule 982
Judicial Council of California
982(e)(16) [Rev. January 1, 1991]

982A16.1   JCF93.1

**ATTORNEY'S CERTIFICATE OF SERVICE**

I, Fay Arfa, declare: I am an active member of the State Bar of California and not a party to the cause, and my business address is 10100 Santa Monica Blvd., Suite 300, Los Angeles, California 90067; that on February 19, 2007, I served the: MOTION FOR NEW TRIAL on the interested parties in this action by enclosing the document(s) by placing a true copy enclosed in separate, sealed envelope(s), with postage fully prepaid in the United States mail at Los Angeles, County of Los Angeles, California  addressed as follows:

Tracy Rinauro
Deputy District Attorney
401 Civic Center Drive West
Santa Ana, CA 92702


     I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on February 20, 2007, at Los Angeles, California.


                              Fay Arfa, Attorney